Taylor, J.
This case involves a dispute between Auto-Owners Insurance Company and its insureds, Janna L. Frank and the decedent, Paul K. Wilkie, regarding underinsured-motorist coverage.[1] Defendant Auto-Owners argues that plaintiffs Frank and Wilkie’s[2] recoveries from Auto-Owners are limited under the terms of the policy to $50,000 each. Frank and Wilkie argue that they are each owed $75,000. The trial court and Court of Appeals agreed with Frank and Wilkie. We reverse.
I. FACTS
On April 17, 1996, Janna Frank was driving east on Maple Rapids Road in Clinton County, with Paul Wil *44 kie as a passenger. At the same time, Stephen Ward was driving west on Maple Rapids Road. Witnesses described his driving as erratic shortly before his vehicle crossed the center line and collided with Frank’s car, injuring her and causing the deaths of Ward and Wilkie.
Ward’s vehicle was insured under a Citizens Insurance Company no-fault automobile-insurance policy having limits of $50,000. Wilkie’s estate and Frank shared this sum, with each receiving $25,000. Wilkie’s vehicle was insured under an Auto-Owners no-fault automobile-insurance policy that provided, in addition to the mandatory coverages required under Michigan’s no-fault automobile-insurance statute, MCL 500.3101 et seq., an optional coverage described as underinsured-motorist coverage. Speaking generally, this coverage was intended to supplement insurance proceeds received by the insured from the tortfeasor had the tortfeasor not been underinsured. This added coverage had limits of $100,000 for each person to a total of $300,000 for each occurrence and also provided that Auto-Owners’ liability was limited to the amount by which these limits exceeded the underinsured motorist’s own insurance coverage. The policy clearly stated that the Auto-Owners’ limits of liability were not to be increased because of the number of persons injured, claims made, or automobiles involved in the accident.[3]
*45 Auto-Owners did not contest that the accident was Ward’s fault and agreed that both Wilkie’s and Frank’s damages were at least $100,000. Disputed, however, was the total amount due from Auto-Owners to Wilkie and Frank. Auto-Owners asserted that it only owed Wilkie and Frank $50,000 each. As it understood the contract terms, the $100,000 policy limit would be reduced by the $50,000 coverage of the Ward policy. Wilkie and Frank, for their part, claimed that Auto-Owners owed each of them $75,000. They reasoned that, having equally split the Ward policy limits of $50,000, only the $25,000 they received should have been subtracted from the $100,000 policy limit to determine the amount each was due.
Unable to reach a resolution of this dispute, Wilkie and Frank sought declaratory relief against Auto- *46 Owners in the Clinton Circuit Court. The plaintiffs moved for summary disposition predicated on their understanding of the contract’s requirements. The trial court granted their motion and ruled that only the amount actually received by each of them, $25,000, and not the entire amount of Ward’s policy limits, $50,000, should be set off against the amount available to them, $100,000, under the underinsuredmotorist provision. Thus, according to the trial court, Wilkie and Frank were each entitled to $75,000 from Auto-Owners.
Auto-Owners appealed, and the Court of Appeals[4] held that the language of the Auto-Owners policy was ambiguous in directing how to apply the underinsured policy limit as a setoff against the amounts Auto-Owners owed. That is, Auto-Owners’ or the insured’s readings were equally plausible, or as the Court described it, the contract, in this particular, could be interpreted in “at least two ways ....” Id. at 527. Pursuant to the doctrine of interpreting an ambiguous contract against the drafter,[5] it construed the language that it found unclear against the drafter and in favor of the insureds. Id. Thus, each claimant was awarded $75,000. The Court bolstered this by stating that the conclusion was the same as one that a utilization of the doctrine of “reasonable expectations” would produce. The Court determined the reasonable expectation of an insured with a similar policy was to expect to always be able to predict with certainty how much coverage will be available from an under- *47 insured, motorist Accordingly, to allow the insurer to utilize variables such as the number of claimants, automobiles involved, claims made, or suits brought to alter the amount due the insured would run the contract afoul of those expectations. To preclude this occurring, the Court concluded that the Court’s duty was to conform the contract to what it had determined was reasonable to expect in a contract of this sort. In this case, that meant that on the basis of variables such as those mentioned above, which were, in fact, included in the Auto-Owners policy, Auto-Owners could not alter the insured’s recovery. The sum of this argument was to return the Court’s consideration to the clauses they had already determined were ambiguous, and, thus, to the earlier conclusion that Auto-Owners was required to pay Wilkie and Frank $75,000 each.
We granted Auto-Owners leave to appeal.[6]
H. STANDARD OF REVIEW
The proper interpretation of a contract is a question of law, which this Court reviews de novo. Archambo v Lawyers Title Ins Corp, 466 Mich 402, 408; 646 NW2d 170 (2002). The same standard applies to the question of whether an ambiguity exists in an insurance contract. Farm Bureau Mut Ins Co v Nikkei, 460 Mich 558, 563; 596 NW2d 915 (1999). Accordingly, we examine the language in the contract, giving it its ordinary and plain meaning if such would be apparent to a reader of the instrument. Bianchi v *48 Automobile Club of Michigan, 437 Mich 65, 71 n 1; 467 NW2d 17 (1991).
III. ANALYSIS
A
Under the language of the underinsurance policy at issue here, the insurer agreed to pay $100,000[7] for each person to a total of $300,000 for each occurrence for bodily or compensatory damages to individuals covered by the policy if each person would have been entitled to recover all those sums from the other driver, but was precluded from doing so because the other driver was underinsured (¶ l[a] and [b]).[8] The insurer’s liability was then limited by a provision (¶ 4[a][l] and [2]) that states that the amount by which the $100,000 for each person to a total of $300,000 for each occurrence exceeds the total limits available to the owner or operator of the underin *49 sured vehicle will determine the amount to be paid.[9] Further clarity is given to this clause by the next provisions (¶ 4[a][2] and [3]), which say that the amounts available are not increased because of the claims made or persons injured.[10]
The Court of Appeals, as urged by the plaintiffs, approached this language by holding that ¶ 4(a)(1) of the contract was ambiguous because it could be “reasonably understood in differing ways.” 245 Mich App 524. That is, ¶ 4(a)(1) of the contract could be interpreted to direct that the $100,000 from the Auto-Owners policy be reduced by either $50,000 or $25,000, depending on how one chose to read it. That being the case, the Court construed the contract against its drafter, Auto-Owners. The Court’s ambiguity analysis of the language of ¶ 4(a)(1) is, at best, questionable because the language appears clearer than the Court found it to be. Paragraph 4(a)(1) *50 states that the limit of liability for underinsuredmotorist coverage shall not exceed “the amount by which the Underinsured Motorist Coverage limits stated in the Declarations exceeds the total limits of all bodily injury liability bonds and policies available to the owner or operator of the underinsured automobile . . . (Emphasis added.) In this case, the under-insured-motorist coverage limit stated in Auto-Owner’s declaration is $100,000. The total limit of all bodily-injury liability policies available to the owner of the underinsured automobile, i.e., Ward, is $50,000. Therefore, the amount by which the underinsuredmotorist-coverage limits stated in the declarations exceeds the total limits of all bodily-injury policies available to the owner of the underinsured automobile is clearly $50,000, not $75,000. Contrary to the contention of Court of Appeals, this provision cannot be “reasonably understood” to be referring to the amount actually received by the claimant because the provision specifically refers to the total available to the owner. Yet, whatever the merits of the Court of Appeals analysis, the panel’s conclusion is fatally undermined when ¶ 4(a)(1) is read, as it must be,[11] with ¶¶ 4(b)(2) and (3). These later paragraphs settle any perceived ambiguity in ¶ 4(a)(1) by stating that the amounts to be paid will not be increased because of claims made, suits brought, or persons injured. Interpreting this provision to mean that each plaintiff is entitled to $75,000 would increase the limit of liability “because of” the number of claims brought or *51 persons injured, which is clearly contrary to the plain language of ¶¶ 4(b)(2) and (3).[12]
Quite simply, if ¶ 4(a)(1) appears ambiguous by itself, when read with ¶¶ 4(b)(2) and (3) the ambiguity is eliminated. That being the case, the insurance contract at issue is unambiguous and should be enforced as its terms dictate. Thus, no consideration of the doctrine of construing the contract against the drafter is appropriate.
B
The Court of Appeals, in declining to give the contract the construction ¶¶ 4(b)(2) and (3) compel, also relied on the argument that to allow such a construction would defy the insured’s reasonable expectations, which, as the Court characterized them, would be that no change in the amount due would be occasioned by the vicissitudes of such things as claims made or persons injured.
This approach, where judges divine the parties’ reasonable expectations and then rewrite the contract accordingly, is contrary to the bedrock principle of American contract law that parties are free to contract as they see fit, and the courts are to enforce the agreement as written absent some highly unusual circumstance, such as a contract in violation of law or public.policy. This Court has recently discussed, and reinforced, its fidelity to this understanding of contract law in Terrien v Zwit, 467 Mich 56, 71; 648 *52 NW2d 602 (2002). The notion, that free men and women may reach agreements regarding their affairs without government interference and that courts will enforce those agreements, is ancient and irrefutable. It draws strength from common-law roots and can be seen in our fundamental charter, the United States Constitution, where government is forbidden from impairing the contracts of citizens, art I, § 10, cl l.[13] Our own state constitutions over the years of statehood have similarly echoed this limitation on government power.[14] It is, in short, an unmistakable and ineradicable part of the legal fabric of our society. Few have expressed the force of this venerable axiom better than the late Professor Arthur Corbin, of Yale Law School, who wrote on this topic in his definitive study of contract law, Corbin on Contracts, as follows:
One does not have “liberty of contract” unless organized society both forbears and enforces, forbears to penalize him for making his bargain and enforces it for him after it is made. [15 Corbin, Contracts (Interim ed), ch 79, § 1376, P 17.]
In contrast to this legal pedigree extending over the centuries, the rule of reasonable expectations is of recent origin. Moreover, it is antagonistic to this understanding of the rule of law, and is, accordingly, in our view, invalid as an approach to contract interpretation.
The rule of reasonable expectations had innocent origins in 1970. Professor Robert E. Keeton of *53 Harvard Law School wrote an article entitled Insurance law rights at variance with policy provisions, 83 Harv L R 961, 967 (1970), in which he examined and attempted to rationalize a number of cases in which the results appeared to defy the principle that contracts will be construed according to their unambiguous terms. To explain this phenomenon, as best he could, he concluded that certain courts would evidently not enforce clear contract language in the face of one of the parties’ “reasonable expectations” of coverage. As Professor Keeton described it:
The objectively reasonable expectations of the applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provision would have negated those expectations. [Id.]
Whether Professor Keeton intended this analysis to spawn a frontal assault on the ability of our citizens to manage, by contract, their own affairs, it had that effect because numerous courts, to one degree or another, adopted some form of the rule.[15]
*55 Michigan has had a puzzling histoiy with the doctrine. The first mention of the rule of reasonable expectations in Michigan was in Zurich Ins Co v Rombough, 384 Mich 228, 232-233; 180 NW2d 775 (1970), in which this Court held, unexceptionally, that ambiguous policy provisions in an insurance contract had to be construed against the insurance company and in favor of the insured. In the course of this holding, the Court cited a California Supreme Court case, Gray v Zurich Ins Co, 65 Cal 2d 263, 269-270; 54 Cal Rptr 104; 419 P2d 168 (1966), in which Justice Mathew Tobriner fleetingly referenced the rule of reasonable expectations.[16] Whatever the effect on California law Gray created, we must assume that our Court’s use of the quotation was only to fully outline Justice Tobriner’s position, because Rombough was decided on the basis of construing against the drafter *56 and the remarks about the rule of reasonable expectations were obiter dicta.
Nonetheless, Rombough is the case that opened the door to the rule of reasonable expectations in Michigan. The next case to address the issue is Bradley v Mid-Century Ins Co, 409 Mich 1, 60-61; 294 NW2d 141 (1980). Discussing a setoff provision in an insurance contract, the Court, in an equivocal passage of the opinion, held that “[t]he set-off clause, whether regarded as ambiguous or inconsistent with the rule of reasonable expectations of the insured, cannot be enforced as written.” Id. Regarding Michigan authority, the Bradley Court cited Rombough. Id. at 61 n 69.[17]
By 1982, however, when this Court next addressed the rule in Raska v Farm Bureau Ins Co, 412 Mich 355, 362-363; 314 NW2d 440 (1982), a majority of the Court took pains to reject the rule of reasonable expectations. Justice Kavanagi-i, writing for the majority, pithily targeted the difficulty with the rule of reasonable expectations as follows:
[T]he expectation that a contract will be enforceable other than according to its terms surely may not be said to be reasonable. If a person signs a contract without reading all of it or without understanding it, under some circumstances that person can avoid its obligations on the theory that there was no contract at all for there was no meeting of the minds.
But to allow such a person to bind another to an obligation not covered by the contract as written because the first *57 person thought the other was bound to such an obligation is neither reasonable nor just. [Id.]
Interestingly, the majority did not mention the Bradley decision of only two years before. We surmise this was not an oversight, a finding reinforced by the fact that there had been no change in the composition of the Court in those two years. Rather, we conclude that the majority did not refer to Bradley because it reasoned that Bradley was premised on an ambiguity analysis or, perhaps, the requirement to conform automobile-insurance contracts to the requirements of the no-fault automobile-insurance act. Thus, it was probable that the majority considered any discussion of the rule of reasonable expectations in Bradley dicta, not requiring analysis. Buttressing this view is the fact that, Justice Williams, writing in dissent, invoked the rule of reasonable expectations, but never cited Bradley as support for his position. Raska, supra at 380.
This was not the end of the rule of reasonable expectations, however, because it was again mentioned in a plurality opinion in Powers v Detroit Automobile Inter-Ins Exch, 427 Mich 602, 631-635; 398 NW2d 411 (1986). In writing the plurality opinion,[18] Chief Justice Williams cited Raska for the proposition that a reasonable expectation of a reader of the contract was enforceable. Id. at 631. This is a curious source of authority, as the Raska majority made no mention of that proposition. Moreover, breaking new ground, the Powers plurality also stated that the rule of reasonable expectations does not require an ambi *58 guity as a prerequisite to the application of the doctrine. Powers, supra at 631 n 7.[19] For additional authority, the plurality relied on Rombough and Bradley for the limited proposition that insured parties do not have a reasonable expectation of coverage in the face of antistacking clauses in insurance contracts. The Powers plurality apparently misconceived the preceding Michigan cases regarding the acceptance in this state of the rule of reasonable expectations. In any case, whatever the Powers opinion’s difficulties, it remains a plurality opinion and thus is not binding on subsequent courts. People v Carines, 460 Mich 750, 767 n 15; 597 NW2d 130 (1999).[20]
In 1991, in Vanguard Ins Co v Clarke, 438 Mich 463, 471-472; 475 NW2d 48 (1991), this Court again discussed the rule, agreeing with the Powers plurality and holding the rule to be an adjunct to the rules of construction of insurance contracts.[21] This was an unusual use of precedent because Powers was not binding and Raska was. Adding to the confusion, the Court characterized the “sole issue” in the case as whether to adopt the theory of dual or concurrent causality in insurance. Vanguard, supra at 465-466. This issue was resolved without any need to delve into the doctrine of reasonable expectations, and, *59 thus, discussion of reasonable expectations was merely dicta.
In the wake of Vanguard, this Court applied, but did not address the provenance of, the rule of reasonable expectations, apparently assuming it to be the law. See Gelman Sciences, Inc v Fidelity Cas Co, 456 Mich 305, 318; 572 NW2d 617 (1998) (citing Vanguard and Powers); Fire Ins Exch v Diehl, 450 Mich 678, 687; 545 NW2d 602 (1996) (citing Powers); and Michigan Millers Mut Ins Co v Bronson Plating Co, 445 Mich 558, 594 n 17; 519 NW2d 864 (1994) (citing Powers and Vanguard). Significantly, none of these cases mentions Raska.
We next discussed the rule of reasonable expectations in Nikkei. This Court approvingly cited Raska and, repudiating the Powers approach, stated:
[W]e decline defendants’ invitation to discern ambiguity solely because an insured might interpret a term differently than the express definition provided in a contract. “This court has many times held that one who signs a contract will not be heard to say, when enforcement is sought, that he did not read it, or that he supposed it was different in its terms.” ... To the extent that the plurality in Powers gleaned ambiguity by relying on an understanding of a term that differed from the clear definition provided in the policy, Powers is contrary to the most fundamental principle of contract interpretation—the court may not read ambiguity into a policy where none exists. [Nikkei, supra at 567-568.]
We concluded by holding that, while the rule of reasonable expectations was, at most, an adjunct to the rules of construction, there was no occasion to invoke it because, under Vanguard, it could only be utilized where there was an ambiguity in the contract, which was not present in Nikkei. Id. at 568-569.
*60 Viewing the puzzling thirty-three-year history of the rule of reasonable expectations in Michigan, we are confronted with a confused jumble of ignored precedent,[22] silently acquiesced to plurality opinions,[23] and dicta,[24] all of which, with little scrutiny, have been piled on each other to establish authority. At no point has an effort been made to establish priorities among the competing holdings. To bring order to this area of the law, it falls on us today to clearly articulate the status of the rule of reasonable expectations in this jurisdiction.
The rule of reasonable expectations clearly has no application to unambiguous contracts. That is, one’s alleged “reasonable expectations” cannot supersede the clear language of a contract. Therefore, if this rule has any meaning, it can only be that, if there is more than one way to reasonably interpret a contract, i.e., the contract is ambiguous, and one of these interpretations is in accord with the reasonable expectations of the insured, this interpretation should prevail. However, this is saying no more than that, if a contract is ambiguous and the parties’ intent cannot be discerned from extrinsic evidence, the contract should be interpreted against the insurer. In other words, when its application is limited to ambiguous contracts, the rule of reasonable expectations is just a surrogate for the rule of construing against the drafter. As the Court of Appeals has recently explained:
*61 Well-settled principles of contract interpretation require one to first look to a contract’s plain language. If the plain language is clear, there can be only one reasonable interpretation of its meaning and, therefore, only one meaning the parties could reasonable expect to apply. If the language is ambiguous, longstanding principles of contract law require that the ambiguous provision be construed against the drafter. Applied in an insurance context, the drafter is always the insurer. Thus, it appears that the “rule of reasonable expectations” is nothing more than a unique title given to traditional contract principles applied to insurance contracts .... [Singer v American States Ins, 245 Mich App 370, 381 n 8; 631 NW2d 34 (2002).]
Several commentators have expressed this same view. See Comment, A critique of the reasonable expectations doctrine, 56 U Chi L R 1461, 1468 (1989) (The rule of reasonable expectations “is identical to the practice of construing ambiguities against the insurer except that it purports to provide an additional justification for doing so, i.e., to satisfy the insured’s reasonable expectations.”); Popik & Quackenbos, Reasonable expectations after thirty years: A failed doctrine, 5 Conn Ins L J 425, 429 (1998) (“Courts applying an ‘ambiguity’-based version of the doctrine have apparently abandoned the doctrine as a rule of substantive law altogether, treating it instead as a rule of construction analogous to—indeed, virtually indistinguishable from—the contra proferentem, doctrine.”); Henderson, The doctrine of reasonable expectations in insurance law after two decades, 51 Ohio St L J 823, 827 (1990) (“[D]ecisions using [the rule of reasonable expectations] solely to construe [ambiguous] policy language do not support a new principle at all, but fall within the time-honored canon *62 of construing ambiguities against the drafter of the contract—contra proferentem.”).
In sum, the rule of reasonable expectations clearly has no application when interpreting an unambiguous contract because a policyholder cannot be said to have reasonably expected something different from the clear language of the contract. Further, it is already well established that ambiguous language should be construed against the drafter, i.e., the insurer. Therefore, stating that ambiguous language should be interpreted in favor of the policyholder’s reasonable expectations adds nothing to the way in which Michigan courts construe contracts, and thus the rule of reasonable expectations should be abolished.
The rights and duties of parties to a contract are derived from the terms of the agreement. Evans v Norris, 6 Mich 369, 372 (1859). As this Court has previously stated, “The general rule [of contracts] is that competent persons shall have the utmost liberty of contracting and that their agreements voluntarily and fairly made shall be held valid and enforced in the courts.” Terrien, supra at 71, quoting Twin City Pipe Line Co v Harding Glass Co, 283 US 353, 356; 51 S Ct 476; 75 L Ed 1112 (1931).[25] Under this legal principle, the parties are generally free to agree to whatever they like, and, in most circumstances, it is beyond the authority of the courts[26] to interfere with the parties’ *63 agreement. St Clair Intermediate School Dist v Intermediate Ed Ass’n, 458 Mich 540, 570-572; 581 NW2d 707 (1998). Respect for the freedom to contract entails that we enforce only those obligations actually assented to by the parties. Evans, supra at 372. We believe that the rule of reasonable expectations markedly fails in this respect. The words of Justice Kavanagh bear repeating:
[T]he expectation that a contract will be enforceable other than according to its terms surely may not be said to be reasonable. If a person signs a contract without reading all of it or without understanding it, under some circumstances that person can avoid its obligations on the theory that there was no contract at all for there was no meeting of the minds.
But to allow such a person to bind another to an obligation not covered by the contract as written because the first person thought the other was bound to such an obligation is neither reasonable nor just. [Raska, supra at 362-363.]
Accordingly, we hold that the rule of reasonable expectations has no application in Michigan, and those cases that recognized this doctrine are to that extent overruled.
IV. conclusion
We reverse the judgment of the Court of Appeals and find the insurance contract between Auto-Owners and Wilkie unambiguously limited Auto-Owners’ liability to $50,000 each for Wilkie and Frank.
Corrigan, C.J., and Young and Markman, JJ., concurred with Taylor, J.

 The policy holder was Wilkie’s mother, Kay Wilkie.

 The personal representative of Paul Wilkie’s estate, Kay Wilkie, is the plaintiff in this case.

. The relevant portions of the contract provide as foEows:
2. COVERAGE
a. We wEl pay compensatory damages any person is legaEy entitled to recover:
(1) from the owner or operator of an underinsured automobUe;
*45 (2) for bodily injury sustained while occupying or getting into or out of an automobile that is covered by Section II—LIABILITY COVERAGE of the policy.
4. LIMIT OF LIABILITY
a. Our Limit of Liability for Underinsured Motorists Coverage shall not exceed the lowest of:
(1) the amount by which the Underinsured Motorist Coverage limits stated in the Declarations exceed the total limits of all bodily injury liability bonds and policies available to the owner or operator of the underinsured automobile; or
(2) the amount by which compensatory damages for bodily injury exceed the total limits of those bodily irjury liability bonds and policies.
b. The Limit of Liability is not increased because of the number of:
(1) automobiles shown or premiums charged in the Declarations;
(2) claims made or suits brought;
(3) persons injured; or
(4) automobiles involved in the occurrence.

 245 Mich App 521; 629 NW2d 86 (2001).

 Klapp v United Ins Group Agency, Inc, 468 Mich 461; 663 NW2d 447 (2003); Raska v Farm Bureau Ins Co, 412 Mich 355, 362; 314 NW2d 440 (1982).

. 467 Mich 868 (2002).

 The actual policy language states “$100,00 person/$300,000 occurrence” (emphasis added). That this is a typographical error is clear because the parties agree that the policy actually refers to limits of $100,000 per person.

 Under ¶ 1(a) and (b) of Wilkie’s policy with Auto-Owners, an underinsured automobile
[i]s an automobile to which a bodily injury liability bond or policy applies at the time of the occurrence:
a. In at least the minimum amounts required by [state law]; and
b. In which the limits of liability are less than the amount of damages the injured person is legally entitled to recover for bodily rqjuiy.
Paragraph 2(a)(1) of the contract states that Auto-Owners “will pay compensatory damages any person is legally entitled to recover . . . from the owner or operator of an underinsured automobile.” See n 3 where this provision is set out in context.

 The limiting language of the policy, ¶ 4(a), states:
(1) the amount by which the Underinsured Motorist Coverage limits stated in the Declarations exceed the total limits of all bodily injury liability bonds and policies available to the owner or operator of the underinsured automobile; or
(2) the amount by which compensatory damages for bodily injury exceed the total limits of those bodily injury liability bonds and policies.
See n 3 where this provision is set out in context.

 Paragraph 4(b) of the policy states:
b. The Limit of Liability is not increased because of the number of:
(2) claims made or suits brought;
(3) persons injured ....
See n 3 where this provision is set out in context.

 We read contracts as a whole, giving harmonious effect, if possible, to each word and phrase. Singer v Goff, 334 Mich 163, 168; 54 NW2d 290 (1952).

 If there were only one claimant, Auto-Owners’ limit of liability would clearly be $50,000. Plaintiffs argue, however, that because there are two claimants, Auto-Owners’ limit of liability is $75,000. This cannot be true because the policy specifically states that Auto-Owners’ limit of liability shall not increase “because of’ the number of claimants.

 “No state shall. . . pass any ... Law impairing the Obligation of Contracts . . . .”

 See, for example, Const 1963, art 1, § 10.

 Writing in 1990, Professor Roger C. Henderson of the University of Arizona School of Law discussed the development of the doctrine in the years after 1970. See Henderson, The doctrine of reasonable expectations in insurance law after two decades, 51 Ohio St L J 823, 827-838 (1990), outlining the development of the doctrine. According to Professor Henderson, the following ten jurisdictions have clearly adopted the rule: Lambert v Liberty Mut Ins Co, 331 So 2d 260, 263 (Ala, 1976); Stewart-Smith Haidinger, Inc v Avi-Truck, Inc, 682 P2d 1108, 1112 (Alas, 1984); Gordinier v Aetna Cas & Surety Co, 154 Ariz 266, 272; 742 P2d 277 (1987); Smith v Westland Life Ins Co, 15 Cal 3d 111, 121-122; 123 Cal Rptr 649; 539 P2d 433 (1975); Farm Bureau Mut Ins Co v Sandbulte, 302 NW2d 104 (Iowa, 1981); Transamerica Ins Co v Royle, 202 Mont 173; 656 P2d 820 (1983); Nile Valley Coop Grain & Milling Co v Farmers Elevator Mut Ins Co, 187 Neb 720; 193 NW2d 752 (1972) (construing standard fire policy); Catania v State Farm Life Ins Co, 95 Nev 532; 598 P2d 631 (1979); Grimes v Concord Gen Mut Ins Co, 120 NH 718; 422 A2d 1312 (1980); *54 Werner Industries, Inc v First State Ins Co, 112 NJ 30; 548 A2d 188 (1988) .
Professor Henderson notes that seventeen jurisdictions have adopted some form of the rule at various times: Davis v MLG Corp, 712 P2d 985, 986 (Colo, 1986); Simses v North American Co for Life & Health Ins, 175 Conn 77; 394 A2d 710 (1978); Hallowell v State Farm Mut Automobile Ins Co, 443 A2d 925 (Del, 1982); Richards v Hanover Ins Co, 250 Ga 613; 299 SE2d 561 (1983); Fortune v Wong, 68 Hawaii 1; 702 P2d 299 (1985); Eli Lilly & Co v Home Ins Co, 482 NE2d 467 (Ind, 1985); Gowing v Great Plains Mut Ins Co, 207 Kan 78; 483 P2d 1072 (1971) (applying reasonable expectations of insured as a rule for resolving ambiguities); Simon v Continental Ins Co, 724 SW2d 210 (Ky, 1986); Cataldie v Louisiana Health Service & Indemnity Co, 456 So 2d 1373 (La, 1984); Baybutt Constr Corp v Commercial Union Ins Co, 455 A2d 914 (Me, 1983), but see Peerless Ins Co v Brennon, 564 A2d 383 (Me, 1989) (reversing Baybutty, Powers v Detroit Automobile Inter-Ins Eocch, 427 Mich 602; 398 NW2d 411 (1986); Atwater Creamery Co v Western Nat’l Mut Ins Co, 366 NW2d 271 (Minn, 1985) (Wahl, J., lead opinion); Brown v Blue Cross & Blue Shield of Mississippi, 427 So 2d 139 (Miss, 1983); Davison v Business Men’s Assurance Co of America, 85 NM 796; 518 P2d 776 (1974); Great American Ins Co v CG Tate Constr Co, 303 NC 387; 279 SE2d 769 (1981) rev’d on other grounds 315 NC 714; 340 SE2d 743 (1986); American Universal Ins Co v Russell, 490 A2d 60, 62 (EH, 1985); Nat’l Mut Ins Co v McMahon & Sons, 177 W Va 734; 356 SE2d 488 (1987); Garriguenc v Love, 67 Wis 2d 130; 226 NW2d 414 (1975). Pennsylvania has taken an inconsistent approach. Compare Standard Venetian Blind Co v American Empire Ins Co, 503 Pa 300, 307; 469 A2d 563 (1983), which rejects the rule, with Tonkovic v State Farm Mut Automobile Ins Co, 513 Pa 445; 521 A2d 920 (1987), which accepts the rule.
For the purpose of fully understanding the rule, Professor Henderson also pointed out that ten jurisdictions have not adopted the rule: Casey v Highland Ins Co, 100 Idaho 505, 509; 600 P2d 1387 (1979); Bain v Benefit Trust Life Ins Co, 123 Ill App 3d 1025, 1032; 463 NE2d 1082 (1984); Bond Bros v Robinson, 393 Mass 546, 551; 471 NE2d 1332 (1984); Walle Mut Ins Co v Sweeney, 419 NW2d 176, 181 n 4 (ND, 1988); Sterling Merchandise Co v Hartford Ins Co, 30 Ohio App 3d 131, 135; 506 NE2d 1192 (1986); Anderson v Continental Assurance Co, 1983 Ok Civ App 25; 666 P2d 245, 248 (1983); Allstate Ins Co v Mangum, 299 SC 226, 231; 383 SE2d 464 (1989) ; Keenan v Industrial Indemnity Ins Co, 108 Wash 2d 314, 322; 738 P2d 270 (1987); St Paul Fire & Marine v Albany Co School Dist 1, 763 P2d 1255, 1263 (Wy, 1988).
The remaining jurisdictions, in Professor Henderson’s opinion, have not addressed the issue, or, have managed to avoid ruling on it. See also Max True Plastering Co v United States Fidelity & Guarantee Co, 1996 Ok 28; 912 P2d 861, 863 n 5 (1996), for a discussion of the doctrine’s acceptance.

 Justice Tobriner, writing for the California Supreme Court in [Gray, supra], construing similar provisions, said:
“In interpreting an insurance policy we apply the general principle that doubts as to meaning must be resolved against the insurer and that any exception to the performance of the basic underlying obligation must be so stated as clearly to apprise the insured of its effect.
“These principles of interpretation of insurance contracts have found new and vivid restatement in the doctrine of the adhesion contract. As this court has held, a contract entered into between two parties of unequal bargaining strength, expressed in the language of a standardized contract, written by the more powerful bargainer to meet its own needs, and offered to the weaker party on a ‘take it or leave it basis’ carries some consequences that extend beyond orthodox implications. Obligations arising from such a contract inure not alone from the consensual transaction but from the relationship of the parties.
“Although courts have long followed the basic precept that they would look to the words of the contract to find the meaning which the parties expected from them, they have also applied the doctrine of the adhesion contract to insurance policies, holding that in view of the disparate bargaining status of the parties we must ascertain that meaning of the contract which the insured would reasonably expect.” [Rombough, supra at 232-233.]

 The Court also cited several of Professor Keeton’s works, pointing out that the rule had been accepted in several jurisdictions. Bradley, supra at 61 n 69.

 Justice Archer concurred with Chief Justice Williams, and Justices Cavanagh and Brickley concurred in the result only.

 The plurality further referred to the rule of reasonable expectations as “[a]n acjjunct to the rules of construction of insurance contracts . . . Powers, supra at 631.

 See also Robinson v Detroit, 462 Mich 439, 470 n 1; 613 NW2d 307 (2000) (Corrigan, C.J., concurring), and People v Anderson, 389 Mich 155, 170; 205 NW2d 461 (1973).

 The Court, however, declined to adopt the Powers plurality’s view that the rule does not require an ambiguity in the contract as a prerequisite to its application. Instead, the Vanguard majority concluded that, without an ambiguity, there could be no application of the rule of reasonable expectations. Id. at 472-473.

 Raska.

 Powers.

 Rombough, arguably Bradley, and Vanguard.

 “Freedom of contract is the general rule and restraint the exception.” Morehead v New York ex rel Tipaldo, 298 US 587, 610-611; 56 S Ct 918; 80 L Ed 1347 (1936).

 Duties imposed by courts are to be avoided in order to respect the freedom of parties to fashion agreements of their own design. See Comment, A critique of the doctrine of reasonable eocpectations, supra at 1487.