**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:    Justices:
Maura D. Corrigan    Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

**FILED JULY 30, 2004**

ALLSTATE INSURANCE COMPANY,

    Plaintiff-Appellee,

v                         No. 122849

ROBERT DANIEL MCCARN, ET AL.,

    Defendants-Appellants,

and

NANCY S. LABELLE, personal representative
of the estate of KEVIN CHARLES LABELLE,
deceased,

    Defendants-Appellants.

_____

BEFORE THE ENTIRE BENCH

TAYLOR, J.

### AFTER REMAND

This case is before us for the second time. In *Allstate Ins Co v McCarn*, 466 Mich 277; 645 NW2d 20 (2002) (*McCarn I*), we held that the shooting death of Kevin LaBelle was "accidental" and, thus, an "occurrence" within the meaning of the insurance policy at issue. Because the

shooting was an "occurrence" covered under the policy, it gave rise to Allstate's potential liability. However, because the Court of Appeals had not addressed whether the criminal-acts exception in the policy precluded coverage,[1] we remanded the matter to that Court. On remand, the Court of Appeals held that the criminal-acts exception precludes coverage in this case.[2] We disagree and reverse the decision of the Court of Appeals. We remand to the trial court for further proceedings.

## I.   FACTS AND PROCEEDINGS

We set forth the facts in our previous opinion:

> This case arises out of the death of sixteen-year-old Kevin LaBelle on December 15, 1995, at the home of defendants Ernest and Patricia McCarn, where their grandson, then sixteen-year-old defendant Robert McCarn, also resided. On that day, Robert removed from under Ernest's bed a shotgun Robert's father had given him the year before. The gun was always stored under Ernest's bed and was not normally loaded. Both Robert and Kevin handled the gun, which Robert believed to be unloaded. When Robert was handling the gun, he pointed it at Kevin's face from approximately one foot away. Robert pulled back the hammer and pulled the trigger and the gun fired, killing Kevin.

> Nancy LaBelle, representing Kevin's estate, brought the underlying action against Robert and his grandparents, Ernest and Patricia McCarn, who had a homeowners insurance policy with plaintiff

---

[1] Unpublished opinion per curiam, issued October 3, 2000 (Docket No. 213041).

[2] Unpublished opinion per curiam, issued November 15, 2002 (Docket No. 213041).

2

Allstate. Allstate brought the present action, seeking a declaratory judgment that it had no duty to indemnify defendants Robert, Ernest, or Patricia McCarn.

Plaintiff and defendants moved for summary disposition in the declaratory action. The trial court granted defendants' motions for summary disposition and denied plaintiff's, holding that the events constituted an "occurrence" within the meaning of Allstate's policy. The trial court also held that Robert McCarn's conduct was not intentional or criminal within the meaning of Allstate's policy.

Allstate appealed to the Court of Appeals, which reversed the trial court in an unpublished opinion.[1] The Court attempted to apply our recent decisions in *Nabozny v Burkhardt*[2] and *Frankenmuth Mut Ins Co v Masters*[3] and concluded that "Robert's intentional actions created a direct risk of harm that precludes coverage." [*McCarn I* at 279-280.]

[1] Issued October 3, 2000 (Docket No. 213041).

[2] 461 Mich 471; 606 NW2d 639 (2000).

[3] 460 Mich 105; 595 NW2d 832 (1999).

This Court reversed the decision of the Court of Appeals, holding that the "accident" was an "occurrence" as defined in the insurance policy at issue, thus giving rise to Allstate's potential liability. *Id*. at 291. Once a court decides that liability may exist under an insurance policy, it may then determine whether coverage is precluded by an exception. *Allstate Ins Co v Freeman*, 432 Mich 656, 668; 443 NW2d 734 (1989). Because the Court of Appeals originally found no liability, it did not determine whether the criminal-acts exclusion precluded coverage under the

policy. Because the Court of Appeals had not addressed this exclusion, we remanded the issue to that Court to determine if it applied. *McCarn I* at 291.

On remand, the Court of Appeals, in a split opinion, applied the two-pronged test from *Freeman* and concluded that Robert acted criminally under the first prong of the test because his actions constituted manslaughter under MCL 750.329. Slip op at 2-4. The Court of Appeals determined that the applicability of the exclusionary clause "turns on whether LaBelle's death was reasonably expected to result from Robert's criminal act." Slip op at 3. The panel then concluded that "a person who points a gun at another person's face and intentionally pulls the trigger without checking to see whether the gun is loaded can reasonably expect that injury will result." Slip op at 4. The dissenting judge also applied the two-pronged test from *Freeman*, but concluded that "reasonable minds could differ regarding whether Kevin's death occurred as the natural, foreseeable, expected, and anticipated result of Robert's" acts. Slip op at 3 (White, J., dissenting). We granted defendants' application for leave to appeal. 469 Mich 947 (2003).

## II. STANDARD OF REVIEW

To determine whether Allstate is obligated to indemnify the McCarns, we examine the insurance policy at

4

issue.    Issues involving the proper interpretation of insurance contracts are reviewed de novo.  *Cohen v Auto Club Ins Ass'n*, 463 Mich 525, 528; 620 NW2d 840 (2001). An insurance policy must be enforced in accordance with its terms, which are given their "commonly used meaning" if not defined in the policy.  *Frankenmuth Mut Ins Co v Masters*, 460 Mich 105, 112, 114; 595 NW2d 832 (1999).

### III. ANALYSIS

When this case was last before us, in interpreting the following language, "Allstate will pay damages . . . arising from an occurrence," we concluded that, on the basis of undisputed facts, the shooting was an accident triggering Allstate's liability.  Justice Cavanagh, writing for the Court, said:

> [T]his case does not present a question of fact. The fact that Robert believed the gun was unloaded is a matter about which there is no genuine issue of material fact. This is because there is nothing in the record to reasonably support a conclusion that, contrary to Robert's testimony that he believed the gun was unloaded, he consciously believed the gun was loaded, or even contemplated that there was any possibility that it was loaded when he pulled the trigger. Even plaintiff, the insurer, acknowledged that Robert believed the firearm was unloaded when he pulled the trigger . . . . [*McCarn I, supra* at 285-286.]

To this set of facts we then applied the requisite subjective test and concluded that Robert's expectation that no bodily harm would result from an unloaded gun was

reasonable. *Id*. at 291. The wisdom of shooting even an unloaded gun at another in the first place was, and is, not before us.

In this case, we deal with other policy language, which is commonly described as the criminal-acts exclusion. It states:

> We do not cover any bodily injury or property damage intended by, or which may reasonably be expected to result from the intentional or criminal acts or omissions of, any insured person. This exclusion applies even if:
>
> a) such insured person lacks the mental capacity to govern his or her conduct;
>
> b) such bodily injury or property damage is of a different kind or degree than intended or reasonably expected; or
>
> c) such bodily injury or property damage is sustained by a different person than intended or reasonably expected.
>
> This exclusion applies regardless of whether or not such insured person is actually charged with, or convicted of a crime.

This language directs us to apply a two-pronged test. There is no insurance coverage if, first, the insured acted either intentionally or criminally, and second, the resulting injuries were the reasonably expected result of an insured's intentional or criminal act. We agree with the Court of Appeals that the first prong of this test—that there was an intentional or criminal act—has been met.

6

Answering the second prong of the test, whether the resulting injury was the reasonably expected result of this criminal act, requires this Court to engage in an objective inquiry.  *Allstate Ins Co v Freeman*, 432 Mich 656, 688; 443 NW2d 734 (1989) (opinion by Riley, J.).  That is, we are to determine whether a reasonable person, possessed of the totality of the facts possessed by Robert, would have expected the resulting injury.  This requirement to base the objective reasonability test on all the facts has been discussed by scholars of tort law:  "The conduct of the reasonable person will vary with the situation with which he is confronted.  The jury must therefore be instructed to take the circumstances into account . . . ."  Prosser & Keeton, Torts (5th ed), § 32, at 175.  We have held similarly in our cases, "[T]he reasonable person standard examines the totality of the circumstances to ensure a fair result."  *Radtke v Everett*, 442 Mich 368, 391; 501 NW2d 155 (1993).  This means that here we must consider not just that Robert, as the Court of Appeals described it, "point[ed] a gun at another person's face and intentionally pull[ed] the trigger," but also, as Allstate itself acknowledges, that Robert thought the gun that he pointed was unloaded.  Slip op, November 15, 2002, p4; *McCarn I,*

7

*supra* at 286.[3]  Thus, we are called on to determine if a reasonable person would have expected bodily harm to result when the gun, in the unloaded state Robert believed it to be, was "fired."  The answer is no because, obviously, an unloaded gun will not fire a shot.  As this Court explained in *McCarn I, supra* at 290-291:

> [No] bodily harm could have been foreseen from Robert's intended act, because he intended to pull the trigger of an unloaded gun, and, thus, it was not foreseeable, indeed it was impossible, under the facts as Robert believed them to be, that shot would be discharged.

To recapitulate, the proper test is that we are to first determine what Robert actually believed about the gun being loaded, not what a reasonable third party would have believed on that issue.  Then, using that belief as a starting point, we are to determine in the second step if a reasonable person, possessed of Robert's belief, would have expected bodily harm to result from pulling the trigger.  In fact, because reasonable minds could not differ that an

---

[3]  That Robert believed the gun was unloaded is uncontested.  Allstate has never argued, as it might have, that Robert did not believe the gun was unloaded.  To the contrary, Allstate's brief in support of its motion for summary disposition notes that Robert pulled the trigger even though "he thought the gun was unloaded."  Even when arguing most recently before this Court, counsel for Allstate said, "It is a fact that he subjectively believed that the gun was unloaded," and, "Subjectively he believed it wasn't loaded."  Because Allstate did not contest this issue, there is no disputed issue of fact regarding his belief.

unloaded gun will not fire a shot, it is appropriate under MCR 2.116(C)(10) to grant summary disposition to defendants.

#### IV. RESPONSE TO DISSENTS

The dissent of Justice Weaver is predicated on the notion that insurance policies should not cover the acts of foolish, reckless, or even lawless people. This is a peculiar view because these are among the very people that society wishes to be insured and, in some circumstances, such as motor vehicle insurance, even requires to be insured. MCL 500.3101. She seems to regard insurance as solely benefiting the insured and thus when it pays out it is a form of reward. This overlooks, however, the societal benefit that insurance provides to those injured or damaged by the acts of insured but otherwise uncollectible individuals. The true beneficiary of liability insurance is not the insured, but his injured victim. The Court of Appeals said this aptly twenty years ago:

> [I]t is unlikely that [an] insured [is] induced to engage in the unlawful conduct by reliance upon the insurability of any claims arising therefrom or that allowing insurance coverage . . . would induce future similar unlawful conduct . . . . Nor does it appear that the policy was obtained in contemplation of a violation of the law. Furthermore, coverage does not allow the wrongdoer unjustly to benefit from his wrong. It is not the insured who will benefit, but the innocent victim who will be provided compensation for her injuries.

9

[*Vigilant Ins Co v Kambly*, 114 Mich App 683, 687; 319 NW2d 382 (1982) (citations omitted).]

As for Justice Young's dissent, he posits that the majority opinion is based on the majority's public policy notions. We disagree. Rather, our decision is based entirely on the language of the insurance policy at issue here. The policy excludes coverage of injuries which "may reasonably be expected to result from the intentional or criminal acts" of the insured. Because one would not reasonably expect injury to result from pulling the trigger of an unloaded gun, coverage is not excluded.

He further indicates that the majority has conflated the subjective and objective inquiries called for by the policy and has gutted the exclusion of any use to the insurer. We again disagree. We have simply drawn the line the policy calls for between what the insured believed at the point of the intentional or criminal act and applied to that belief what a reasonable person could expect to result from that act. Thus if, as here, an insured believes a gun is unloaded, and in this case it is conceded by the insurer that Robert indeed did believe that, then no reasonable person could believe, given that starting point, that a shot would come from the gun when fired. On the other hand, if an insured believes a gun is loaded and operable when he points it at someone and pulls the trigger but, for

whatever reason, expects no shot to come from it and thus does not expect harm to result, there would be no coverage because a reasonable person would expect a shot to come from a loaded, operable gun and that harm would result from that.[4]  The point is the insured's expectations of what will result from his act are irrelevant.

It should also be pointed out that we believe that the effect of Justice Young's position would be that if a harm or injury results from an intentional or criminal act it will almost never be covered under a policy with this exclusion.  This result can be seen in his approach to this case.  Because he can reason back and know that the gun was loaded, he concludes that the policy exclusion dictates that there is no insurance coverage.  Yet, we believe such hindsight reasoning is an improper mode of analysis for this accident.  In hindsight, an insurer might always be able to reason backwards from an accident and conclude that, by definition, a reasonable person would not have done whatever precipitated such accident.

The dissents' approaches would eviscerate insurance policies of much of their value to insureds, leaving only "occurrences that were truly unexplainable" covered. *McCarn I*, *supra* at 289.  Yet, unforeseen, unfortunate

---

[4] This is essentially what happened in *Freeman*.

consequences of explicable or even intentional acts are "the very purpose of insurance . . . ." *Id*. at 288. As this Court stated in *McCarn I, supra* at 288, "We must be careful not to take the expectation of harm test so far that we eviscerate the ability of parties to insure against their own negligence." "Otherwise, liability insurance coverage for negligence would seem to become illusory." *Id.* "The problem, as we see it, with the dissent's opinion is that it undermines the ability of insureds to protect themselves against their own foolish or negligent acts." *Id.* "However, the impetus for insurance is not merely, or even principally, to insure oneself for well thought out and reasoned actions that go wrong, but to insure oneself for foolish or negligent actions that go wrong. Indeed, it is obviously the latter that are more likely to go astray and to precipitate the desire for insurance." *Id.* To the extent that the dissents would erode the ability of insureds to protect themselves against theirs—or their family members'—foolish or stupid acts, they would eviscerate insurance contracts of much of their purpose and value. This is simply to say that with Justice Young's approach there would be seemingly no coverage for any intentional or criminal act where there was injury resulting from the act. This would narrow those having insurance in such circumstances greatly and perhaps

entirely. This disturbing outcome cannot be what this policy provision intended, nor is it what the policy language calls for.

## V. CONCLUSION

We hold that there is no question of fact whether Kevin's death was the reasonably expected result of Robert's act. Accordingly, we reverse the judgment of the Court of Appeals and remand to the trial court for further proceedings.

Clifford W. Taylor
Marilyn Kelly
Stephen J. Markman


CAVANAGH, J.

I concur in the result only.

Michael F. Cavanagh

**S T A T E   O F   M I C H I G A N**

**SUPREME COURT**

ALLSTATE INSURANCE COMPANY,

    Plaintiff-Appellee,

v                                                          No. 122849

ROBERT DANIEL MCCARN, ET AL,

    Defendants-Appellants,

and

NANCE S. LABELLE, personal representative
of the estate of KEVIN CHARLES LABELLE,
deceased,

    Defendants-Appellants.

---

WEAVER, J. (*dissenting*).

I would hold that the intentional and criminal acts exclusion of the homeowner's insurance policy at issue excludes coverage in this case. I would remand this case to the trial court for entry of summary judgment for defendant. I, therefore, dissent from both the result and reasoning of the lead opinion.

After sharing a bowl of marijuana, Robert McCarn intentionally aimed a shotgun at Kevin LaBelle's face without checking whether the shotgun was loaded. McCarn's testimony revealed that he was horse playing, but intended

to frighten LaBelle into sharing some crackers with him. When McCarn pulled the trigger, the gun discharged and LaBelle was killed. McCarn pleaded nolo contender to a charge of manslaughter, MCL 750.321.

The intentional or criminal acts exclusion of the policy now at issue unambiguously states:

> We do not cover any bodily injury or property damage intended by, or which may reasonably be expected to result from the intentional or criminal acts or omissions of, any insured person. This exclusion applies even if:
>
> a) such insured person lacks the mental capacity to govern his or her conduct.
>
> b) such bodily injury or property damage is of a different kind or degree than intended or reasonably expected; or
>
> c) such bodily injury or property damage is sustained by a different person than intended or reasonably expected.
>
> This exclusion applies regardless of whether or not such insured person is actually charged with, or convicted of a crime.

Unambiguous insurance policy language must be enforced as written. *Farm Bureau Ins Co v Nikkel*, 460 Mich 558, 570; 596 NW2d 915 (1999).

This Court addressed a similar exclusionary clause in *Allstate Ins Co v Freeman*, 432 Mich 656, 685; 443 NW2d 734 (1989). The exclusion at issue in *Freeman* provided:

> We do not cover any bodily injury or property damage which may reasonably be expected to result from the intentional or criminal acts

of an insured person or which is in fact intended by an insured person. [*Freeman* at 685.]

*Freeman* held that the exclusionary clause at issue in that case relieved the insurer of liability if "(1) the insured acted *either* intentionally *or* criminally, and (2) the resulting injuries occurred as the natural, foreseeable, expected, and anticipated result of an insured's intentional or criminal acts." *Id.* at 700 (emphasis in original).

Though similar to the policy at issue in *Freeman*, there are important differences to the policy language at issue in this case. The criminal acts exclusion of the homeowner's insurance policy at issue in this case is broader than that in *Freeman*. It includes three subsections that expressly expand the scope of the exclusion. Relevant to this case, subsection b provides

"[t]his exclusion applies even if . . . Such bodily injury or property damage is of a different kind or degree than intended or reasonably expected. . . ."

Subsection b applies because "even if" indicates that the subsections are included in and help define the policy exclusion. Thus, consideration of the specific policy language at issue in this case requires some adjustment to *Freeman's* second prong for this case. Subsection b shifts the inquiry away from the actual injury that resulted from intentional or criminal actions, to whether *any* bodily

3

injury or property damage could be reasonably expected to result from the actions.

Nevertheless, to the extent the policy at issue in this case is similar to the policy at issue in *Freeman,* *Freeman's* two-pronged objective test is instructive. *Freeman, supra* at 700, correctly identified the first question under policy language before the Court as whether "the insured acted *either* intentionally *or* criminally." I agree with the lead opinion that the policy requirement that McCarn acted intentionally or criminally is met. McCarn acted intentionally when he pulled the trigger of a gun while pointing it at LaBelle's face. As correctly explained by the Court of Appeals, McCarn's actions were also criminal.

Regarding whether it was reasonable to expect injury or property damage would result from the intentional or criminal act, it is the consensus of this Court *Freeman* correctly employed an objective inquiry. The dispositive question under the language of this policy and the facts of this case should be, therefore, whether a reasonable person would expect bodily injury or property damage to result when a person points a gun at another person's face without determining whether the gun was loaded and then pulls the trigger.

4

While the lead opinion acknowledges that the language "may reasonably be expected" dictates an objective standard, *ante* at 7, the lead opinion's rationale only pretends to be objective. By focusing on McCarn's belief that the gun was unloaded, *ante* at 7, the lead opinion abandons the objective standard in favor of the subjective belief of a teenager under the influence of marijuana. Fortunately, the lead opinion's rationale will not bind future decisions, because it was joined by only two other justices. One justice joins the lead opinion in result only. Three justices agree that the lead opinion incorrectly transforms the objective standard into a subjective standard.

An established rule in construing insurance contracts is that "[a]n insurer is free to define or limit the scope of coverage as long as the policy language fairly leads to only one reasonable interpretation and is not in contravention of public policy." *Heniser v Frankenmuth Mut Ins Co*, 449 Mich 155, 161; 534 NW2d 502 (1995). The lead opinion implies that it is against public policy to deny coverage in this case. *Ante* at 8. To indirectly support this suggestion, the lead opinion vaguely alludes to the no-fault act, MCL 500.3101 *et seq. Ante* at 8. However, the lead opinion utterly fails to understand that the no-

5

fault act is irrelevant to this case because there is an important difference between no-fault insurance and the homeowner's insurance. In the no-fault act, the Legislature expressly requires that the insurer provide residual coverage for intentionally caused damages. MCL 500.3135(3)(a). There is no such requirement imposed on homeowner's insurance providers by any statute. Had the Legislature intended to require homeowner's insurance providers to cover criminal and intentional acts it could have done so. Thus the lead opinion has not established that the homeowner's insurance policy exclusion at issue is against public policy.[1] The lead opinion twists the

---

[1] Not only is the no-fault act irrelevant to the this case, the lead opinion's citation of *Vigilant Ins Co v Kambly,* 114 Mich App 683, 687; 319 NW2d 382 (1982) is also entirely irrelevant and inapplicable. *Vigilant* involved whether a medical malpractice insurer was required to provide coverage for a malpractice claim against a doctor who engaged in sexual activity with a patient under the guise of medical treatment. It should be noted that medical malpractice is governed by different statute than homeowner's insurance. Moreover, the malpractice insurance policy in that case contained no criminal or intentional acts exclusion. Thus, the Court of Appeals panel declined to read a criminal and intentional acts exclusion into the policy. The panel concluded, *supra* at 687-688, that the doctor's actions were a covered form of malpractice and noted "[i]n this instance, there is great public interest in protecting the interests of the injured party." Nevertheless, the panel noted, *id* at 687, that there are "public policy considerations raised by [the medical malpractice insurer] which prohibit the insurability of criminal or intentionally tortuous conduct" which were not present on the facts of that case. Thus, *Vigilant* does not support the lead opinion's policy-making intentions.

6

objective standard required by the policy exclusion at issue in this case into a subjective standard in order to justify holding "an insurer liable for a risk it did not assume."[2]

In this case, interpreting the unambiguous terms of this homeowner's insurance policy exclusion, the relevant focus is on whether *any* bodily injury or property damage could reasonably be expected from the McCarn's intentional or criminal act. The intentional and criminal acts exclusion of the homeowner's insurance policy at issue in this case plainly and unambiguously excludes coverage under these facts since bodily injury can reasonably be expected to result when, without first determining that a gun is unloaded, a person points the gun at another person and pulls the trigger.

For these reasons, I dissent from the lead opinion and would affirm the decision of the Court of Appeals excluding coverage under the intentional and criminal acts exclusion of the home owner policy at issue.

Elizabeth A. Weaver
Maura D. Corrigan

---

[2] *Farm Bureau, supra* at 568, citing *Auto-Owners Ins Co v Churchman*, 440 Mich 560, 567; 489 NW2d 431 (1992).

## STATE OF MICHIGAN

## SUPREME COURT

ALLSTATE INSURANCE COMPANY,

    Plaintiff-Appellee,

v                                 No. 122849

ROBERT DANIEL MCCARN, ET AL,

    Defendants-Appellants,

And

NANCY S. LABELLE, personal representative
of the estate of KEVIN CHARLES LABELLE,
deceased,

    Defendants-Appellants.

_____

YOUNG, J. (*dissenting*).

    I concur fully in the dissenting opinion of Justice WEAVER, but write separately to highlight the import of Justice TAYLOR's lead opinion: Today, the members of the lead opinion,[1] for unarticulated policy reasons of their own, ignore the explicit contract language at issue and obliterate the distinction recognized in our law between

---

[1] I note that the lead opinion has garnered only three votes for its rationale; Justice CAVANAGH has concurred only in the result. Therefore, the lead opinion has no precedential value. *People v Jackson*, 390 Mich 621, 627; 212 NW2d 918 (1973).

subjective and objective standards in insurance exclusion provisions.[2]

In an apparent policy-driven view that even the most fanciful beliefs merit insurance coverage, the standard articulated by the lead opinion conflates any meaningful distinction between a subjective and objective contractual standard. The lead opinion cites no precedent or other legal authority for its position. There is none. The new alleged "objective standard" announced in the lead opinion today leaves an insurer unable to exclude even the most dangerous intentional or criminal behavior from coverage as a matter of law, so long as an insured *claims* to believe that something innocuous would result from his dangerous conduct.[3] The policy language of exclusion at issue here

---

[2] I can only hope that this departure from the general principle that contracts are to be enforced as written is a limited one that will not recur. Compare, *Wilkie v Auto-Owners Ins Co*, 469 Mich 41, 51; 664 NW2d 776 (2003), wherein this Court reinforced the "bedrock principle of American contract law that parties are free to contract as they see fit, and the courts are to enforce the agreement as written absent some highly unusual circumstance, such as a contract in violation of law or public policy."

[3] I do not believe that it is possible for Allstate to disprove Robert's claimed beliefs regarding the status of the gun. Allstate could prove that the belief was not reasonable under the circumstances, but I am unsure how they could prove that the belief did not in fact exist. Moreover, the evidence does not support a finding that Allstate *conceded* that Robert thought the gun was unloaded.

2

could not more explicitly preclude coverage for the intentional or criminal conduct of an insured. I believe it to be the view of those joining the lead opinion that it would violate an as yet unarticulated "public policy" if an insurer could by contract preclude coverage under the facts of this case. Indeed, the lead opinion (and its bastardization of the traditional objective standard that should be applied here) seems driven by its concern that "an intentional or criminal act . . . will almost never be covered by a policy with this exclusion". My response is that I am prepared to enforce the contract the parties have made as written.[4]

Insurance contracts generally provide indemnity against injuries caused by "accidents". When they expressly exclude coverage for injuries caused by

At most, Allstate merely agreed that Robert *said* he believed the gun to be unloaded. Conceding that Robert made a statement and conceding that his statement was true are entirely different matters.

[4] The lead opinion suggests that I conclude that an intentional or criminal act "will almost never be covered under a policy with this exclusion". I do not. I *do* believe that each case will turn on its facts and that what is "reasonable" may have to be determined by a trier of fact. I am agnostic regarding whether all, a majority or no cases involving a criminal act are covered under policy language at issue here so long as the policy language is given meaning. I will not, as the lead opinion does, ignore the contract language and "direct the verdict" as a matter of law by manipulating the traditional objective standard of review.

*intentional* or *criminal* behavior as determined by a "reasonable person" objective standard, I am prepared to apply the traditional, unvarnished objective standard Michigan courts have employed in assessing whether the injury was "*reasonably expected*".

The intentional or criminal acts exclusion of the policy at issue precludes coverage for injuries or damage "which may reasonably be expected to result" from the intentional or criminal acts or omissions of an insured. For time out of mind until now, common law courts have understood the distinction between subjective and objective standards.[5] An objective test assesses what a reasonable

---

[5] For an example of how we have consistently described the reasonable person objective standard in Michigan, *Radtke v Everett*, 442 Mich 368, 390-391, 501 NW2d 155, 166 (1993) describes the standard as follows:

> As described by Dean Prosser, the reasonable person standard has been carefully crafted to formulate one standard of conduct for society: The standard of conduct which the community demands must be an external and objective one, rather than the individual judgment, good or bad, of the particular actor; and it must be, so far as possible, the same for all persons, since the law can have no favorites.
> * * *
> The courts have gone to unusual pains to emphasize the abstract and hypothetical character of this mythical person. He is not to be identified with any ordinary individual, who might occasionally do unreasonable things; he is

4

person would have believed, while a subjective test is concerned about determining what the actual actor believed. In this context, where all members of this Court agree the contract requires application of an objective standard, I contend that what may "reasonably be expected to result" from an insured's acts is the conclusion a reasonable person reaches after examining all of the pertinent information available to the insured. See footnote 5. The belief of the insured, on the other hand, is the *subjective* conclusion reached *by the insured* armed with the same information. While the belief of the insured may be a

a prudent and careful person, who is always up to standard.... He is rather a personification of a community ideal of reasonable behavior, determined by the jury's social judgment. The chief advantage of this standard is that it enables triers of fact to look to a community standard rather than an individual one, and at the same time to express their judgment of what that standard is in terms of the conduct of a human being.' *Furthermore, the reasonable person standard examines the totality of the circumstances to ensure a fair result*. Hence, the reasonable person standard is sufficiently flexible to incorporate gender as one factor, without destroying the vital stability provided by uniform standards of conduct (Emphasis added; internal citation omitted).

Justice Taylor approvingly cited to this passage in his concurring statement in *Sidorowicz v Chicken Shack, Inc*, 469 Mich 912; 673 NW2d 106 (2003). Thus, his position in the present case is hard to reconcile with his previous position regarding the correct application of the objective reasonable person standard.

5

fact, it is not an ultimate fact[6] essential to determining what may reasonably be expected to result from an insured's actions.

The lead opinion errs in using the insured's subjective belief (purportedly) "as a starting point," then insisting that the "objective" evaluation proceed by determining whether a reasonable person, *sharing the insured's subjective belief*, would expect the same result. Requiring that the reasonable person take as a determinative fact the insured's subjectively beliefs about his acts violates every known formulation or application of the traditional objective standard. The majority cites no authority for its contrary and idiosyncratic formulation of its "objective" standard. It is noteworthy that, in other contexts, this Court has expressly repudiated similar efforts to make subjective an objective standard.[7]

Thus, it is unclear why (and on what authority) the lead opinion concludes that a reasonable person should be required to possess the same (and entirely subjective) belief as the insured.

---

[6] Black's Law Dictionary defines ultimate facts as those "facts essential to the right of action or matter of defense; facts necessary and essential for decision by court."

[7] See, *Radtke v Everett,* 442 Mich 368; 501 NW 2d 155 (1993).

6

As I argued in *McCarn I*, a reasonable person could certainly come to a different belief regarding the expected consequences under the known and undisputed facts of this case.[8] Under the standard announced by the lead opinion, I cannot envision a single scenario where a "reasonable person" expectation could *ever* diverge from the insured's expectation.[9] More critically, I am at a loss to determine any difference, much less a qualitative one, between the purported objective standard articulated in the lead opinion today and the policy exclusion language found to

---

[8] It is important to recall that all of the facts and circumstances known about this shooting were provided by McCarn's deposition testimony. McCarn owned the shotgun and admitted that he did not check to see whether the gun was loaded before he deliberately pulled the trigger when the barrel of the gun was one foot away from his friend's face. He also admitted to being the last person to use the gun, and could not recall whether he unloaded the gun on that occasion because he put the gun away "hot" — hurriedly in order to avoid being caught using the weapon without adult supervision. He further admitted to intentionally pulling the trigger of the gun in an effort to frighten the victim into sharing crackers. According to the lead opinion, none of these undisputed facts provided by McCarn himself are relevant in evaluating how a reasonable person would have assessed the circumstances of the shooting because it concludes that the *only* relevant fact is the insured's stated subjective belief that his gun was unloaded.

[9] Indeed, the lead opinion incentivizes insureds to manufacture their "beliefs" about insurance controversies because, no matter how incompatible with the circumstances or logic, the insured's belief is the one that *must* be assumed by the "reasonable person" when applying the lead opinion's so-called "objective" test.

7

require a subjective determination in *Metropolitan Ins v DiCicco*.[10] There, a policy which excluded damage "expected or intended from the *standpoint of the insured*" was found to require a subjective standard of expectation.[11]

I note that, had the views of the lead opinion garnered majority support, the subjective standard would have become the uniform standard for all insurance policies, no matter what language was actually used. Under the standard articulated by the lead opinion, an insurance company would be required to provide coverage even where, for example, an insured believes that his gun was magical and would only play "The Star Spangled Banner" when the trigger was pulled. After all, using the insured's claimed belief as a starting point, no reasonable person would expect that bodily harm would result from a rousing rendition of our national anthem.[12] I invite those Justices

---

[10] 432 Mich 656; 443 NW2d 734 (1989).

[11] *Id.*, 672. Had the policy language in this case been similar to that found in *DiCicco*, I might agree with the lead opinion's resolution.

[12] The majority disclaims that its new objective test is anything novel and that all it is doing is drawing a "line … between what the insured believed at the point of the intentional or criminal act and applied it to what a reasonable person could expect to result *from that act*."

joining the lead opinion to explain why its analysis today would permit a contrary result.

For these reasons, I would affirm the judgment of the Court of appeals.

Robert P. Young, Jr.
Maura D. Corrigan

---

*Ante* at 11 (emphasis added). In actuality, the lead opinion is not considering what a reasonable person would expect to *result* from the insured's act, but the insured's stated *subjective belief* about the consequences of his act. This is the "Russian Roulette" theory of objective standards: "if I think the bullet is in another chamber, I'm covered."

Consequently, I see nothing inconsistent with my hypothetical example (using an insured's absurd belief that his gun would play the national anthem when discharged as a basis for recovery under this policy) and the lead opinion's application of its so-called objective standard to the known facts of this case. *Id.* And the lead opinion is especially hard pressed to explain why an insured's absurd beliefs should not be given absolute credence when it applies its version of the objective standard when the insured says he thought the gun was inoperable, unloaded, or simply magical.

9