NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2008-1467

NATIONAL INSTITUTE FOR STRATEGIC TECHNOLOGY
ACQUISITION AND COMMERCIALIZATION,

Plaintiff-Appellant,

v.

FORD MOTOR COMPANY,

Defendant-Appellee.

Warren S. Huang, Fulbright & Jaworski, L.L.P., of Houston, Texas, argued for plaintiff-appellant. With him on the brief was Robert M. Chiaviello, Jr., of Dallas, Texas.

Eric A. Buresh, Shook, Hardy & Bacon, L.L.P., of Kansas City, Missouri, argued for defendant-appellee.

Appealed from: United States District Court for the Eastern District of Texas

Judge David J. Folsom

NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2008-1467

NATIONAL INSTITUTE FOR STRATEGIC TECHNOLOGY
ACQUISITION AND COMMERCIALIZATION,

Plaintiff-Appellant,

v.

FORD MOTOR COMPANY,

Defendant-Appellee.

Appeal from the United States District Court for the Eastern District of Texas in case no. 5:08-CV-84, Judge David J. Folsom.

_____

DECIDED: April 23, 2009

_____

Before RADER, BRYSON, and MOORE, <u>Circuit Judges</u>.

Opinion for the court filed by <u>Circuit Judge</u> MOORE. Dissenting opinion filed by <u>Circuit Judge</u> BRYSON.

MOORE, <u>Circuit Judge</u>.

The National Institute for Strategic Technology Acquisition and Commercialization (NISTAC) appeals the grant of Ford Motor Company's (Ford) motion to dismiss NISTAC's patent infringement claims under Federal Rule of Civil Procedure 12(b)(6). The United States District Court for the Eastern District of Texas determined that NISTAC's claims were barred by paragraph 3.3 of an October 31, 2000 agreement (the donation agreement) by which the patents–in–suit were assigned to NISTAC's

predecessor. Because we conclude that the language of the donation agreement unambiguously releases Ford from any and all claims arising from NISTAC's enforcement of the patents at issue, we <u>affirm</u> the district court's grant of Ford's motion to dismiss.

## BACKGROUND

Ford originally assigned four U.S. patents, Nos. 5,239,955, 5,319,919, 5,469,777, and 5,554,020 (collectively, the patents–in–suit), to Ford Global on March 1, 1997.[1] On October 31, 2000, Ford Global and the MidAmerica Commercialization Corporation (MACC) executed the donation agreement under which Ford Global assigned thirty patents (the donated patents), including the patents–in–suit, to MACC. Ford Global also agreed to pay MACC $184,000 to cover the maintenance fees of the donated patents. MACC agreed to the disclaimers listed in article 3 of the donation agreement. Based on MACC's status as a not–for–profit company, Ford claimed its assignment as a charitable donation having a value of $26,950,000 for tax purposes.

In March 2006, NISTAC[2] decided to offer the donated patents for sale via a live auction. In response, Ford demanded that NISTAC withdraw two of the patents–in–suit from the auction. NISTAC agreed not to auction the donated patents and granted Ford a non-exclusive license. In exchange, Ford paid NISTAC a $1,000,000 signing fee and agreed to pay reasonable royalties. Less than six months later, Ford notified NISTAC that it was unilaterally terminating the license agreement.

---

[1] Ford Global is a wholly owned subsidiary of Ford that manages Ford's intellectual property.

[2] MACC changed its name to NISTAC in 2004.

Following the termination, NISTAC filed this infringement action. Ford subsequently moved to dismiss the action pursuant to Federal Rule of Civil Procedure 12(b)(6), asserting that paragraph 3.3 of the donation agreement constituted a release that barred NISTAC's claims. The district court granted Ford's motion to dismiss. NISTAC timely appealed.

## DISCUSSION

The parties agree that Michigan law governs the donation agreement. Under Michigan law, "[t]he proper interpretation of a contract is a question of law, which this court reviews de novo. . . . Accordingly, we examine the language in the contract, giving it its ordinary and plain meaning if such would be apparent to a reader of the instrument." Wilkie v. Auto-Owners Ins. Co., 664 N.W.2d 776, 780 (Mich. 2003). "If the contractual language is unambiguous, courts must interpret and enforce the contract as written, because an unambiguous contract reflects the parties' intent as a matter of law." In re Smith Trust, 745 N.W.2d 754, 758 (Mich. 2008). "A contract is ambiguous if its provisions may reasonably be understood in different ways." Universal Underwriters Ins. Co. v. Kneeland, 628 N.W.2d 491, 494 (Mich. 2001).

We review the grant of a dismissal under Rule 12(b)(6) by applying the law of the regional circuit. Phonometrics, Inc. v. Hospitality Franchise Sys., Inc., 203 F.3d 790, 793 (Fed. Cir. 2000).

> In the Sixth Circuit, a dismissal under Fed. R. Civ. P. 12(b)(6) raises a question of law that is subject to de novo review. Bovee v. Coopers & Lybrand C.P.A., 272 F.3d 356, 360 (6th Cir. 2001). The court must construe the complaint in the light most favorable to the plaintiff, accept its factual allegations as true, and determine whether the plaintiff can prove a set of facts in support of its claims that would entitle it to relief. Mayer v. Mylod, 988 F.2d 635, 637-38 (6th Cir. 1993).

2008-1467                                    3

<u>Polymer Indus. Prod. Co. v. Bridgestone/Firestone, Inc.</u>, 347 F.3d 935, 937 (Fed. Cir. 2003).

We must first determine whether the language of the agreement—specifically, the language of paragraph 3.3—is ambiguous. Paragraph 3.3 of the donation agreement states:

> 3.3 For its part, [NISTAC][3] hereby agrees to release [Ford], its officers, directors, employees and agents, and each of them, from any and all claims which [NISTAC] might otherwise have against any of them by reason of the practice of [Ford's] Patent Rights by [NISTAC], its licensees or transferees.

While it is somewhat awkward to base a waiver on NISTAC's practice of Ford's patent rights, it does not render the terms of the donation agreement ambiguous. Paragraph 2.1 explains:

> 2.1 [Ford] hereby assigns and contributes to [NISTAC], at no cost to [NISTAC], [Ford's] entire right, title and interest in the Donated Technology (hereinafter "[Ford's] Patent Rights"). Such assignment and contribution includes [Ford's] right to enforce [Ford's] Patent Rights and to recover damages for any infringement retroactively to the issue date of any patent included in [Ford's] Patent Rights.

According to the plain reading of these provisions, Ford assigned to NISTAC all of Ford's rights in the patents—including the right to enforce the patents. Further, NISTAC agreed to release Ford from any and all claims arising from NISTAC's "practice" of these assigned patent rights. Because the patent rights are defined as including both the right to enforce and the right to recover damages for patent infringement, NISTAC therefore agreed to release Ford from any claims for patent infringement—exactly the claims that NISTAC asserted before the district court. The district court acknowledged

---

[3] Where appropriate, we have replaced the terms "the DONOR" and "the DONEE" with "[Ford]" and "[NISTAC]", respectively.

this waiver, holding that "under the plain meaning of the release of paragraph 3.3 the Court finds that Ford is released from NISTAC's enforcement of the Patent Rights." We agree; the language of paragraph 3.3 is subject to only one reasonable interpretation, and is thus unambiguous. See Universal Underwriters, 628 N.W.2d at 494.

NISTAC further argues that even if the language of paragraph 3.3 is unambiguous, it should be construed to limit the release to NISTAC's "making, using, or selling of the donated technology." NISTAC asserts that the term "practice"—as used in paragraph 3.3—has a specialized meaning in patent law—to make, use, or sell. While we agree that "practice the invention"—a term used in paragraph 2.6 of the donation agreement—could be interpreted as making, using, or selling a claimed invention, that term is not used in paragraph 3.3. Instead, paragraph 3.3 concerns "the practice of [Ford's] patent rights." Paragraph 2.1 of the contract defines Ford's patent rights as including the right to enforce the donated patents, thus by the terms of the contract, NISTAC agreed not to enforce the donated patents against Ford.

To the extent that NISTAC argues that the district court's construction of the contract's terms renders paragraph 3.3 surplusage, we do not agree. Paragraph 3.1 provides that Ford will not indemnify NISTAC from infringement suits by third parties; paragraph 3.2 provides that Ford disclaims any responsibility for NISTAC's use of the patent rights; and paragraph 3.3 provides that Ford is released from any infringement claims by NISTAC based on the donated patents. There is no conflict among the properly construed provisions of the donation agreement.

Finally, NISTAC argues that the district court's construction of paragraph 3.3 must be incorrect because it would be contrary to the parties' stated intentions.

Specifically, NISTAC asserts that if paragraph 3.3 gave Ford a de facto license to the donated patents, then Ford would have been prohibited from claiming a charitable donation—the purpose of the assignment as set forth in paragraph 2.4 of the donation agreement. NISTAC supports its arguments by noting that I.R.S. Notice 2004-7 and Revenue Ruling 2003-28 prohibit the claiming of charitable donations when patent rights are retained.

The district court refused to consider this issue, opining that "[t]he court further does not consider the tax implications as that issue is not before the Court." Similarly, we decline to express any view on the tax consequences to Ford. Even if we were to accept as true NISTAC's assertions regarding the tax consequences, such evidence— extrinsic evidence—cannot be used to alter the plain language of the contract under Michigan law. Mich. Chandelier Co. v. Morse, 297 N.W. 64, 67 (Mich. 1941). We have considered all arguments raised by NISTAC in this appeal and find them unpersuasive.

## CONCLUSION

Because the plain language of the donation agreement bars NISTAC's claims, we affirm the district court's grant of Fords motion to dismiss under Fed. R. Civ. P. 12(b)(6).

NOTE:  This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2008-1467

NATIONAL INSTITUTE FOR STRATEGIC TECHNOLOGY
ACQUISITION AND COMMERCIALIZATION,

Plaintiff-Appellant,

v.

FORD MOTOR COMPANY,

Defendant-Appellee,

Appeal from the United States District Court for the Eastern District of Texas in case no. 5:08-CV-84, Judge David J. Folsom.

BRYSON, Circuit Judge, dissenting.

I respectfully dissent.  Under Michigan law, which controls here, the interpretation of a contract is a question of law if the contract language is unambiguous, but if the language is ambiguous, the interpretation of the contract is a question of fact for the trier of fact.  Klapp v. United Ins. Group Agency, Inc., 663 N.W.2d 447, 451, 453-54 (Mich. 2003).  Because I believe the phrase "practice of [Ford's] Patent Rights" is ambiguous, I would reverse the district court's judgment and remand this case for factual resolution of the ambiguity, including the consideration of extrinsic evidence.

The majority is correct that the term "Patent Rights" is unambiguous, as that term is explicitly defined in the donation agreement to encompass not only the right to make, use and sell the donated technology, but also the right to enforce the patents (although

the agreement ineptly defines the "Patent Rights" in circular fashion as including the right to enforce the "Patent Rights").  The problem with paragraph 3.3 of the agreement, however, is that while the meaning of the term "Patent Rights" is clear, the meaning of the term "practice" is not.  And the meaning of "practice" is critical to defining the scope of the release effected by paragraph 3.3.  For example, if paragraph 3.3 released Ford from any claims based on NISTAC's "exercise" of the patent rights, then paragraph 3.3 would clearly bar NISTAC from enforcing the patents against Ford.  If, on the other hand, paragraph 3.3 released Ford from claims based on NISTAC's "employment" or "performance" of the patent rights, then the release would shield Ford only from claims based on NISTAC's manufacture, use or sale of the donated technology.  It is unclear in this context whether the verb "practice" has a meaning more like "exercise" or more like "employ" or "perform"; each of those interpretations of "practice" finds support in standard dictionaries.  Thus, the phrase "practice of [Ford's] Patent Rights" is ambiguous.

The word "practice" is a term of art in patent law that ordinarily refers to a party's manufacture, use, or sale of a claimed invention, but not a party's enforcement of the rights conferred by the patent.  It is true that paragraph 3.3 does not refer to "practicing the invention" or "practicing the patent," which are the more typical formulations in patent law.  But in light of the fact that the disputed agreement is an agreement concerning patents, it is reasonable to interpret the term "practice" consistently with the use of that term in the patent field.  I submit that no patent lawyer, if presented with the sentence "I intend to practice my patent rights" as a way of expressing an intention to sue for infringement, would be able to resist the compulsion to strike out the sentence

and rewrite it.  Yet the court is in effect saying that the parties to this agreement unambiguously demonstrated their understanding that NISTAC agreed not to sue Ford for infringement by using just such an expression: that NISTAC agrees to release Ford from claims arising "by reason of [NISTAC's] practice of [Ford's] Patent Rights."

The context of paragraph 3.3 adds support to NISTAC's interpretation. Paragraph 3.1 protects Ford against liability to NISTAC for infringement suits by third-party patentees.  Paragraph 3.2 refers to "applications and uses" of the donated technology as well as "future developmental and commercial activities" associated with the donated technology, and in that context states that Ford assumes no responsibility in connection with or arising from NISTAC's practice of Ford's patent rights.  That paragraph protects Ford from suit based on a claim arising from the post-transfer development or use of the technology.  Paragraph 3.3 then states, using language similar to that in paragraph 3.2, that NISTAC releases Ford from claims based on the practice of Ford's patent rights.  In that context, the meaning of paragraph 3.3 that best accords with the parallel language of paragraph 3.2 is that it protects Ford against any claims by NISTAC arising from NISTAC's acts of making, using, or selling the technology.  Thus, for example, paragraph 3.3 would bar NISTAC from seeking indemnification from Ford in the event that a third party, injured in the course of NISTAC's use of the donated technology, sued NISTAC on a products liability theory. While that interpretation of paragraph 3.3 may not be the only one, it is at least a reasonable one.

Conspicuous by its absence from the agreement is a provision, simple enough to draft, that would protect Ford against suit for infringement of the donated patents.  In

fact, what Ford has been required to do to extract such a covenant from paragraph 3.3 is to give that paragraph a 180 degree spin. In a nutshell, Ford argues that a provision that by its terms protects against claims arising from NISTAC's practice of Ford's patent rights actually protects against claims arising from Ford's practice of NISTAC's patent rights.

The parties knew how to draft a provision granting Ford a license so that Ford would be free to practice the patented inventions without fear of being sued by NISTAC for infringement: Paragraph 2.6 of the donation agreement refers to the "royalty-free and non-transferable license to the Donated Technology with rights to practice the inventions thereof" that was granted to another party, Visteon Global Technologies, Inc. Yet the parties failed to use similarly direct language in paragraph 3.3, which at least casts doubt on whether that was their intention. Perhaps, as NISTAC alleges, Ford had an eye to claiming a tax deduction for its donation, and therefore wanted to avoid the appearance that it was retaining an interest in the patents, even in the form of a non-exclusive license. But at the very least, the exercise in circumlocution that is necessary to give paragraph 3.3 the meaning that Ford assigns to it makes it reasonable to conclude that the parties intended paragraph 3.3 to be something other than a simple license-back provision.

Because the term "practice of [Ford's] Patent Rights" is ambiguous, the interpretation of the agreement is a question of fact that, under governing Michigan contract law principles, should not have been disposed of as a matter of law. I would reverse and remand this case so that the agreement can be interpreted by the finder of fact in light of all the available evidence bearing on the parties' intent.