*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

CHERRY HILL RECREATION CENTER, INC.,
doing business as CHERRY HILL LANES,

UNPUBLISHED
June 18, 2026
10:50 AM

Plaintiff-Appellant,

v

CONIFER INSURANCE COMPANY,

No. 374445
Wayne Circuit Court
LC No. 22-004079-CB

Defendant-Appellee.

Before: BORRELLO, P.J., and M. J. KELLY and ACKERMAN, JJ.

PER CURIAM.

Plaintiff Cherry Hill Recreation Center, Inc., appeals the trial court's order granting summary disposition to Conifer Insurance Company in plaintiff's suit seeking benefits under a commercial property insurance policy for damages its bowling alley suffered due to a burst pipe. Because we conclude that there is no genuine issue of material fact that the building at issue was "vacant," we affirm.

## I. FACTS

In 2016, Alan Abbas—a civil engineer by trade—decided to become a bowling proprietor. He purchased a Dearborn Heights bowling alley, Cherry Hill Lanes, and organized two business entities: Link Group Properties LLC, which owned the building, and nominal plaintiff Cherry Hill, which operated the bowling alley. The building was approximately 48,000 square feet. Within it, plaintiff sublet approximately 700 square feet to a "pro shop" named "Strikes & Trophies."

In the late winter of 2020, the COVID-19 pandemic began. On March 16, the Governor issued an emergency declaration that closed various "places of public accommodation . . . to ingress, egress, use, and occupancy by members of the public," including "recreation centers [and] indoor sports facilities." Executive Order No. 2020-9. This order barred plaintiff from operating its bowling center for several months. When winter arrived, Abbas allowed the thermostat to drop significantly, with the building expected to be around 43 degrees Fahrenheit.

On December 18, 2020, the Department of Health and Human Services issued new public health directives that allowed some facilities, including bowling centers, to reopen under certain conditions effective December 21. In the following weeks, Abbas took steps to reopen, which included his daughters working over 40 hours to clean the facility and restock it with necessary supplies, as well as Abbas contacting former employees about returning to work. His intent was to reopen in the middle of February.

However, on February 4, 2021, Abbas discovered significant water damage. A pipe feeding the building's fire-suppression sprinkler had burst after freezing, apparently due to unexpected exposure to outside cold air. Plaintiff submitted a water damage claim to defendant that day. After investigation, defendant denied coverage on December 30, 2021. In its letter, defendant said it was denying coverage because the building was vacant, and the heat had not been properly maintained.

Plaintiff then commenced this breach of contract action against defendant. The trial court proceedings were protracted. Plaintiff initially moved for summary disposition in December 2022, and in June 2023, the trial court granted partial summary disposition, holding that the building was not "vacant" but that a question of fact remained regarding whether plaintiff took sufficient precautions against freezing. The parties moved for reconsideration, which the trial court granted, holding that questions of fact existed as to whether plaintiff had protected its pipes against freezing and whether plaintiff's activities to prepare the building for use were sufficient to avoid it being "vacant." During trial preparation, however, plaintiff's counsel noted to defense counsel that plaintiff would not offer evidence at trial that it had protected the pipes against freezing; instead, the sole issue would be whether the building was "vacant." Defendant promptly moved for summary disposition, arguing that in light of this concession, it should win as a matter of law. The trial court held in defendant's favor. Plaintiff moved for reconsideration, objecting in particular to the trial court's reversal on whether a question of fact existed regarding whether the building was "vacant," but the trial court denied that motion. This appeal followed.

## II. STANDARD OF REVIEW

This case requires the interpretation of a contract, which is a question of law that we review de novo. *Morley v Auto Club of Mich*, 458 Mich 459, 465; 581 NW2d 237 (1998). Trial court rulings on motions for summary disposition are also reviewed de novo. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). In a motion brought under MCR 2.116(C)(10), the trial court considers the documentary evidence submitted by the parties as required by MCR 2.116(G)(5). It may grant the motion if the evidence shows that there is no genuine dispute over the material facts and that the moving party is entitled to judgment as a matter of law.[1] *Quinto v Cross & Peters Co*, 451 Mich 358, 362; 547 NW2d 314 (1996).

---

[1] The dissent maintains that "[i]t is not our role to salvage the trial court's ruling by attempting to function as a 'superior' trial court." We respectfully disagree that any such dynamic is implicated here. Because our review of the trial court's decision is de novo, we are no differently positioned than the trial court was to make a decision as a matter of law on this record. We agree with the

III. ANALYSIS

Plaintiff argues that the trial court erred in granting summary disposition to defendant. We disagree. No reasonable juror could conclude that the bowling alley was not "vacant" under the terms of the insurance policy, and in light of plaintiff's concession that it did not protect the sprinkler system's pipes against freezing, defendant has not breached its contractual obligations to plaintiff.

"An insurance policy is much the same as any other contract. It is an agreement between the parties in which a court will determine what the agreement was and effectuate the intent of the parties." *Auto-Owners Ins Co v Churchman*, 440 Mich 560, 566; 489 NW2d 431 (1992). As a result, we give the language in the contract "its ordinary and plain meaning." *Wilkie v Auto-Owners Ins Co*, 469 Mich 41, 47; 664 NW2d 776 (2003). We generally apply the same interpretive principles used in construing other texts, such as statutes, including that we "give effect to every word, phrase, and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory." *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 468; 663 NW2d 447 (2003) (citation omitted).

Under the policy defendant issued to plaintiff, coverage would not be provided for certain losses plaintiff suffered if the building was "vacant for more than 60 consecutive days" before the loss or damage occurred. One such loss was for "[s]prinkler leakage, unless you have protected the system against freezing[.]" Because plaintiff concedes it did not protect the system against freezing, defendant has no liability to cover damage caused by sprinkler leakage if the building was vacant for at least 60 days prior to the loss. But the policy defines "vacant" in two ways:

(a) When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations.

(b) When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

(i) Rented to a lessee or sub-lessee and used by the lessee or sub-lessee to conduct its customary operations; and/or

(ii) Used by the building owner to conduct customary operations.

---

dissent that the trial court's decision was "far from clear," although we disagree that this impedes "meaningful appellate review," as the fundamental issue is the legal question about the meaning of the contract.

The parties dispute how to construe this language and which definition of "vacant" applies.[2]

As framed by the parties, the policy recognizes three categories: a "tenant," an "owner," or a "general lessee." The parties then look to dictionary definitions and similar sources to determine plaintiff's status. We conclude that this approach is misguided. Rather, the central inquiry is the nature of plaintiff's possessory interest in the building. If plaintiff had an interest in a "unit or suite rented or leased to" it, then it is a "tenant." If it had a possessory interest in "the entire building," then it is an "owner or general lessee."

Here, plaintiff's possessory interest was in the entire building, not merely a "unit or suite." Under the terms of the lease between plaintiff and Link Group, plaintiff was to "occupy the said premises" without exception and "keep the said premises and every part thereof in as good repair" as at the commencement of the lease. Plaintiff then subleased space to the pro shop in the building—at least as evidenced by the check in the record issued from the pro shop to plaintiff (not Link Group) to pay its rent. While it is undisputed that plaintiff did not own the building, the policy's inclusion of "general lessee" appears designed precisely for situations like this: where a party *technically* does not own the building but exercises owner-*like* control over the entire premises under the terms of its lease. It is therefore apparent that plaintiff was a "general lessee" under the policy.

Plaintiff, however, argues that if it is a "general lessee," the building could not be "vacant" under the policy. Under that definition, the building was vacant unless at least 31% of its square footage was "[r]ented to a lessee or sub-lessee" for its customary operations or "[u]sed by the building owner to conduct customary operations." Plaintiff contends that any reference to customary operations of a "general lessee" is "conspicuously absent," meaning that whether it was conducting customary operations was irrelevant.

We disagree. Under the doctrine of *noscitur a sociis*—"it is known from its associates"— "a word or phrase is given meaning by its context or setting." *Tyler v Livonia Pub Sch*, 459 Mich 382, 390-391; 590 NW2d 560 (1999). In context, the policy clearly treats a "general lessee" as equivalent to an "owner." That is evident from the pairing of an "owner or general lessee," which possesses the entire building, contrasted with "tenant," which lacks a possessory interest in the

---

[2] We note that this language appears, essentially verbatim, in several cases from other jurisdictions. See, e.g., *Frankenthal Int'l, LTD v West Bend Mut Ins Co*, 414 Wis 2d 505, 512; 2024 WI App 71; 15 NW3d 904 (2024); *Icarus Holdings 2, LLC v AmGUARD Ins Co*, 601 F Supp 3d 314, 318 (ND Ill, 2022); *Kut Suen Lui v Essex Ins Co*, 185 Wash 2d 703, 713; 375 P3d 596 (2016); *Commerce Bank v West Bend Mut Ins Co*, 870 NW2d 770, 772 (Minn, 2015); *Old Second Nat'l Bank v Ind Ins Co*, 2015 IL App (1st) 140265, ¶ 7; 29 NE3d 1168 (2015); *Bedford Internet Office Space, LLC v Travelers Cas Ins Co*, 41 F Supp 3d 535, 541-542 (ND Tex, 2014); *Suder-Benore Co, LTD v Motorists Mut Ins Co*, 2013-Ohio-3959, ¶ 17; 995 NE2d 1279 (Ohio App, 2013); *Waterstone Bank, SSB v American Family Mut Ins Co*, 348 Wis 2d 213, 216; 2013 WI App 60; 832 NW2d 152 (2013); *Travelers Prop Cas Co v Superior Court*, 215 Cal App 4th 561, 568; 155 Cal Rptr 3d 459 (2013); *Central Mut Ins Co v KPE Firstplace Land, LLC*, 271 SW3d 454, 456-457 (Tex App, 2008).

-4-

entire building. As a result, when the (b)(ii) definition refers to 31% of the space being "[u]sed by the building owner to conduct customary operations," the "building owner" is a "general lessee" if one exists (as is the case here). Although the policy might have been clearer if (b)(ii) said "[u]sed by the building owner *or general lessee* to conduct customary operations," "if a contract, however inartfully worded or clumsily arranged, fairly admits of but one interpretation it may not be said to be ambiguous or, indeed, fatally unclear." *Raska v Farm Bureau Mut Ins Co*, 412 Mich 355, 362; 314 NW2d 440 (1982). Thus, the building was vacant unless plaintiff—the general lessee—was using it to "conduct customary operations."

Plaintiff also challenges the trial court's conclusion that no factual dispute exists regarding whether it was conducting customary operations. Again, we disagree. As Abbas said in his affidavit submitted in support of plaintiff's final motion for reconsideration, "it was [his] intention for Cherry Hill Lanes to reopen to the public in mid-February 2021" and that at "the time of the February 4, 2021 loss, the bowling center had been cleaned up and prepared to open to the public." But being *prepared* to open, even with the *intention* to do so later that month, is not the same as actually being open. The fact that his daughters spent "a total of 43 hours cleaning and preparing Cherry Hill Lanes to reopen to the public for business" does not alter this conclusion.

Plaintiff operated a bowling alley, and its customary operations involved members of the public paying for access to its space and specialized equipment to enjoy the sport of bowling. Cf. *Keren Habinyon Hachudosh D'Rabeinu Yoel of Satmar BP v Philadelphia Indemnity Ins Co*, 462 F Appx 70, 72-73 (CA 2, 2012) (customary operations of a high school require "the instruction of students," not a one-day faculty meeting or using the building for storing school supplies and furniture). Plaintiff does not dispute that bowling had not yet resumed. No reasonable juror could conclude that preparatory acts—even if incidental to normal operations—prevent the building from being "vacant." And while the trial court's change in position may have surprised plaintiff, it cannot show that it was prejudiced by being denied an opportunity to produce responsive facts under MCR 2.116(G)(5). The Abbas affidavit it produced was considered by the trial court on reconsideration and is insufficient to create a genuine issue of material fact.

Finally, plaintiff argues that the building cannot be considered vacant as a matter of law because the COVID-19 public health lockdown measures were not lifted until 45 days prior to the discovery of the burst pipe. Because it would have been illegal for plaintiff to operate its bowling center before that time, plaintiff contends that the 60-day vacancy period could not begin running until the restrictions were lifted.[3] It is true that "[i]f the performance of a duty is made

---

[3] The dissent states that the trial court "determined that the period during which" the public health emergency orders were in effect "could not be included in calculating the 60-day vacancy period as prescribed by the policy." We do not see where in this record the trial court explicitly made such a determination, although it is not unreasonable for the dissent to "understand the trial court to have" made such a decision. In any event, even if the trial court had reached that conclusion, defendant was not required to "challenge th[at] legal determination on appeal." "[A]n appellee, who has taken no cross appeal, may, nevertheless, urge in support of the judgment in his favor reasons rejected by the trial court." *Pontiac Twp v Featherstone*, 319 Mich 382, 390; 29 NW2d

impracticable by having to comply with a domestic or foreign governmental regulation or order, that regulation or order is an event the non-occurrence of which was a basic assumption on which the contract was made." 2 Restatement Contracts, 2d, § 264, p 331. And "[w]here, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary." *Id*. at § 261, p 313. But the insurance policy imposed no duty on plaintiff owed to defendant to conduct customary operations in the building. Plaintiff's only obligation was to pay insurance premiums, which was not rendered impracticable. Defendant's obligation was to provide coverage subject to the policy's terms, including the vacancy provision. Here, the building was vacant, and had been since the pandemic-related shutdowns began nearly 11 months before the burst pipe. "It is impossible to hold an insurance company liable for a risk it did not assume," *Churchman*, 440 Mich at 567, and defendant did not assume the risk of insuring a vacant building—regardless of why it was vacant.[4]

Plaintiff was a "general lessee" under the insurance policy, and no reasonable juror could conclude that the building had not been vacant for 60 days prior to the burst pipe. The timing of the public health response to COVID-19 is not relevant to that determination. The judgment of the trial court is affirmed.

/s/ Michael J. Kelly
/s/ Matthew S. Ackerman

---

898 (1947). Defendant has sought nothing on appeal beyond affirmance of the trial court's order granting summary disposition.

[4] We agree with the dissent that the trial court erred when it stated that "the COVID restriction was lifted far more than 60 days before the loss." As the dissent correctly observes, "it is irrefutable that the interval between the lifting of the COVID-19 restrictions relative to plaintiff's bowling alley and the date of loss was less than 60 days." But we disagree that prudence is served by a remand. Both the meaning of the policy and the effect of the COVID-19 restrictions on defendant's obligations are questions of law that we review de novo, so the trial court would be no better positioned than we are to resolve them.