*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ROBERT SCOTT SWANSON and BONNIE
SWANSON,

        Plaintiffs-Appellants,

v

BITTERSWEET SKI RESORT, INC., and
CHRISTINA REGALADO,

        Defendants-Appellees.

FOR PUBLICATION
August 29, 2024
9:00 a.m.

No. 366258
Allegan Circuit Court
LC No. 2022-065127-NO

Before: PATEL, P.J., and RICK and FEENEY, JJ.

PER CURIAM.

Plaintiffs appeal as of right an order granting summary disposition to defendants under MCR 2.116(C)(8) and (C)(10). We reverse and remand for further proceedings.

## I. FACTUAL BACKGROUND

This action arises out of injuries sustained by plaintiff Robert Swanson on February 9, 2019, at Bittersweet Ski Resort in Otsego, Michigan. Robert was working as a volunteer ski patroller at the resort. At approximately 3:30 p.m. that day, Robert boarded a ski lift to go back to the top of the ski hill. He was carrying a toboggan, which needed to be hooked to the ski lift for transport. Usually, a toboggan would be hooked to the bottom of the ski lift seat so that it was "directly in line with the chair." On the day in question, defendant Christina Regalado was operating the ski lift that Robert was using. According to Robert, Christina directed him to approach the chair on an angle and took the toboggan from him, pulling it in front of the moving chair. She pulled the toboggan in front of the advancing chair at an angle not in line with the direction of travel of the chair, then shifted it so it was in line with the chair over the top of Robert's right ski. Robert was forced to grab the toboggan, which weighed approximately 70 to 80 pounds, and hook it to the chair while the lift was in motion.

As the ski lift left the loading platform and rose into the air, Robert's ski was still trapped by the toboggan. Robert's right ski snagged on an unidentified object—possibly snow or ice—causing his leg to twist under the toboggan. Robert began yelling for Christina to stop the lift.

Robert flipped off the back of the chair and was hanging onto it with his right arm as it moved forward. According to Robert, Christina did not notice him or stop the lift. Christina testified in her own deposition that she had approximately seven seconds to load each chair and could not continue watching Robert because she was already moving on to load the next chair. She further testified that before the ski lift moved off the loading platform, she asked Robert "if he was good," and stated that he gave her a thumbs up and said that he was fine. She did not see him struggle with the toboggan after leaving the loading platform. Robert lost his grip and fell approximately 20 feet to the ground. Robert was injured in the fall and was transported to a local hospital by ambulance for treatment.

Robert and his wife, plaintiff Bonnie Swanson, subsequently filed a complaint against Bittersweet and Christina. Under Count I of the complaint, plaintiffs alleged that defendants violated the Ski Area Safety Act of 1962 (SASA), MCL 408.321 *et seq*. Plaintiffs argued defendants violated the SASA by changing the standard operating procedure for loading toboggans onto ski lifts with no warning, which ultimately resulted in Robert's injuries. Under Count II, plaintiffs alleged that defendants were negligent and breached the duty of ordinary care owed to skiers and ski patrollers. Under Count III of the complaint, plaintiffs made a premises liability claim against defendants, arguing that defendants had a duty to keep the premises in safe condition, as well as to protect and warn skiers of any dangerous defects on the premises, and that they breached those duties by loading Robert and his toboggan onto a ski lift using a different operating procedure without warning him of the danger inherent in doing so. Under Count IV, plaintiffs alleged defendants were grossly negligent and breached the duty of care owed to Robert by implementing a dangerous alternative procedure for loading ski lifts without warning or training skiers about the change. Finally, Bonnie alleged a loss of consortium as a result of the injuries Robert sustained after falling off the lift.

Defendants filed an answer to plaintiffs' complaint and generally denied liability. Along with the answer, defendants filed a number of affirmative defenses. Relevant to this appeal, defendants contended that plaintiffs' claims were barred by the SASA. Defendants also contended that plaintiffs' claims were barred because Robert signed a form that expressly released defendants from liability for any of plaintiffs' injuries.

Defendants later moved for summary disposition under MCR 2.116(C)(7) (claim barred by operation of law), (C)(8) (failure to state a claim), and (C)(10) (no genuine issue of material fact). In a brief in support of the motion, defendants argued that plaintiffs' claims were barred because Robert signed a release form in which he accepted all of the risks inherent in downhill skiing and absolved defendants of any liability for his injuries. Defendants further argued that plaintiffs' claims were barred by the SASA, which holds ski resorts harmless for injuries sustained as a result of the dangers inherent to skiing. Defendants noted that under *Kent v Alpine Valley Ski Area*, 240 Mich App 731, 733, 735; 613 NW2d 383 (2000), this Court found that the SASA barred a claim for negligence brought by a plaintiff who was injured while trying to board a ski lift. Defendants contended that *Kent* was directly on point, and conclusively proved that plaintiffs' claims were barred by the SASA. Defendants went on to argue that plaintiffs failed to show that defendants violated any of the duties required of ski lift operators under the SASA, and that the ski lift itself was inspected and approved by the State of Michigan just three weeks before Robert was injured. Accordingly, defendants asked the trial court to grant their motion for summary disposition and dismiss plaintiffs' claims in their entirety.

In response to defendants' motion for summary disposition, plaintiffs argued that under the plain language of the SASA, a ski lift operator's negligent operation of a ski lift is not a danger inherent to the sport of skiing, which would ordinarily preclude liability from attaching to a ski resort operator under the law. They further contended that even if the SASA did apply, the specific injury at issue was not one that was "obvious and necessary" to the sport of skiing. Plaintiffs also argued that the release did not apply to volunteer ski patrollers like Robert, but rather generally absolved the resort of liability for injuries sustained by individuals engaged in skiing for recreational purposes. However, even if the release did apply to volunteer ski patrollers, plaintiffs argued that it was against public policy and therefore unenforceable. Plaintiffs explained that Robert had to sign the release in order to work as a volunteer ski patroller at the resort. In exchange, he got free season passes for his family to ski at the resort, and was permitted to serve as a ski patroller. Plaintiffs argued that it would be against public policy to hold defendants harmless for Robert's injuries because it would likely deter other volunteer ski patrollers from donating their time to ensure the safety of those skiing for recreational purposes. Plaintiffs asked the court to deny defendants' motion for summary disposition.

At a hearing on the motion, the trial court elected to grant summary disposition to defendants. It reasoned that the SASA barred plaintiffs' claims because the operation of a ski lift is a covered activity under the SASA. The court did not accept plaintiffs' argument that Robert was exempt from the SASA because he was not engaged in skiing for recreation while serving as a volunteer ski patroller:

> The argument regarding that the Plaintiff was not involved in the act of skiing, I appreciate that he was working as a ski patroller and that that doesn't mean he was [a] downhill skier, but based upon my understanding of the facts, the duties of a ski patroller include engaging in downhill skiing to perform his duties, so that argument doesn't carry weight with me and that also applies to the argument [stating] the release is not applicable because there was not skiing involved.

The trial court further found that the release barred plaintiffs' claims. The court noted that along with serving as a volunteer ski patroller, plaintiff received a free season pass to ski at the resort in exchange for signing the release, and that the document did not include any separate provisions exempting volunteer ski patrollers from the general release of liability. Additionally, the trial court concluded that the release did not violate public policy, noting that it was bound to follow this Court's ruling in *Skotak v Vic Tanny Int'l, Inc*, 203 Mich App 616; 513 NW2d 428 (1994). The Court went on to explain:

> [I]t is not unreasonable for someone in the Defendants' position to say, I will give you the chance to [ski], but you can't sue me if you are going to engage in the activity on my property and I think that was bargained for. The ski patrollers also get the enjoyment of engaging in skiing while they—they work and at the end of the day it was a choice that was made by the Plaintiff to sign the release and engaged in the activity of a ski patroller, which in my opinion does include downhill skiing.

The trial court subsequently entered an order granting defendants' motion for summary disposition under MCR 2.116(C)(8) and (C)(10). This appeal followed.

## II. STANDARD OF REVIEW

"This Court reviews de novo the grant or denial of a motion for summary disposition to determine if the moving party is entitled to judgment as a matter of law." *Lowrey v LMPS & LMPJ, Inc*, 500 Mich 1, 5-6; 890 NW2d 344 (2016). To the extent that this case involves questions of law, including questions of statutory interpretation, we also review such matters de novo. *Milot v Dep't of Transp*, 318 Mich App 272, 276; 897 NW2d 248 (2016). Questions regarding the proper interpretation of contracts, such as the release at issue in this case, are also reviewed de novo. *Wilkie v Auto-Owners Ins Co*, 469 Mich 41, 47; 664 NW2d 776 (2003).

A motion under MCR 2.116(C)(8) "tests the legal sufficiency of the complaint solely on the basis of the pleadings." *Dalley v Dykema Gossett*, 287 Mich App 296, 304; 788 NW2d 679 (2010). Summary disposition is warranted when the complaint "failed to state a claim on which relief can be granted." MCR 2.116(C)(8). When considering a motion under subrule (C)(8), this Court "accepts all well-pleaded factual allegations as true and construes them in the light most favorable to the nonmoving party." *Dalley*, 287 Mich App at 304-305.

A motion for summary disposition under MCR 2.116(C)(10) tests the factual sufficiency of a plaintiff's claim. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 160; 934 NW2d 665 (2019). When reviewing the trial court's decision to grant or deny summary disposition under MCR 2.116(C)(10), this Court considers the parties' documentary evidence in the light most favorable to the party opposing the motion. *Johnson v Vanderkooi*, 502 Mich 751, 761; 918 NW2d 785 (2018) (quotation marks and citation omitted). A motion brought under subrule (C)(10) is properly granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *El-Khalil*, 504 Mich at 160. "A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ." *Johnson*, 502 Mich at 761.

## III. ANALYSIS

Plaintiffs argue that the trial court erred by granting summary disposition to defendants. We agree.

## A. LIABILITY UNDER THE SASA

Plaintiffs first contend that the trial court erred by finding that the SASA barred their claims. They instead argue that the SASA does not apply to the claims at issue because Robert was not "participating" in the "sport of skiing," within the meaning of MCL 408.342(2) while he was working in his capacity as a volunteer ski patroller. We agree.

> In addition to establishing duties of care, the SASA provides that skiers and snowboarders assume a risk of injury arising from certain dangers that inhere in the sport: (2) Each person who participates in the sport of skiing accepts the dangers that inhere in that sport insofar as the dangers are obvious and necessary. Those dangers include, but are not limited to, injuries which can result from variations in terrain; surface or subsurface snow or ice conditions; bare spots; rocks, trees, and other forms of natural growth or debris; collisions with ski lift towers and their

components, with other skiers, or with properly marked or plainly visible snow-making or snow-grooming equipment. [MCL 408.342(2).]

When interpreting the language of a statute, our primary goal is to give effect to the intent of the Legislature. *South Dearborn Environmental Improvement Ass'n, Inc v Dep't of Environmental Quality*, 502 Mich 349, 360-361; 917 NW2d 603 (2018). To do so, we begin with the plain language of the statute itself. *Id*. If the language of a statute is unambiguous, it must be enforced as written. *Scugoza v Metro Direct Prop & Cas Ins Co*, 316 Mich App 218, 223; 891 NW2d 274 (2016). Statutes must be read as a whole, "giving effect to every word, phrase, and clause." *Perkovic v Zurich Ins Co*, 500 Mich 44, 49; 893 NW2d 322 (2017).

The SASA was enacted "to provide for the safety of skiers, spectators, and the public using ski areas; to provide for certain presumptions relative to liability for an injury or damage sustained by skiers;" and "to provide for liability for damages which result from a violation of this act[.]" 1962 PA 199. In *Schmitz v Cannonsburg Skiing Corp*, 170 Mich App 692, 695; 428 NW2d 742 (1988), this Court, quoting Senate Legislative Analysis, SB 49 (April 17, 1981), observed:

> By clearly defining the extent to which skiers and ski area operators are liable for damages and injuries sustained in skiing accidents, the bill would help reduce the number of lawsuits in which skiers recover large sums of money for injuries that are primarily their own fault. This, in turn, should stabilize the constantly increasing insurance costs for ski area operators, which have been passed on to skiing enthusiasts through price hikes for ski lift tickets, rental equipment, waxing services, etc.

Thus, it is clear that the SASA was designed to prevent ski area operators from incurring liability for injuries sustained by skiers in skiing accidents. This appeared especially important to the Legislature because skiing, like all sports, possesses some inherent dangers. The Legislature wanted to ensure that ski area operators could continue functioning without having to worry about excessive lawsuits for ski-related injuries.

As relevant to this appeal, the SASA defines "skier" as:

> [A] person wearing skis or utilizing a device that attaches to at least 1 foot or the lower torso for the purpose of sliding on a slope. The device slides on the snow or other surface of a slope and is capable of being maneuvered and controlled by the person using the device. Skier includes a person not wearing skis or a skiing device while the person is in a ski area for the purpose of skiing. [MCL 408.322(g).]

Although "skier" is defined in the statute, the phrase "participates in the sport of skiing" stated in MCL 408.342(2) is not, and plaintiffs suggest that "sport" in that provision gives the activity a specific meaning. Although "skiing" is not directly defined, we find that the description of skiing in MCL 408.322(g) within the definition of "skier" provides a statutory definition: "device slides on the snow or other surface of a slope and is capable of being maneuvered and controlled by the person using the device." Thus, skiing involves a skier on a device that slides on the snow or other surface of the slope that is capable of being maneuvered and controlled by the skier.

But not everyone who is a "skier" or who is "skiing" necessarily "participates in the sport of skiing." A "sport," in the context of an activity like skiing, is commonly understood to be a recreational or competitive physical endeavor. Common examples of sports include football, soccer, kayaking, and, yes, skiing. Each of these activities can be engaged in for recreation or for competition. People who engage in these activities are considered participants. But individuals who are charged with moderating or teaching the activities, such as coaches and referees, are *not* considered participants. They are not participating in the sport, they are enabling and supporting the participants. Skiers can "participate" in the "sport of skiing" by engaging in recreational activity, such as a weekend on the slopes, or they can do so by competing in competitions involving skiing, such as in the Olympics.

Considering the plain meaning of the phrase "participates in the sport of skiing," we agree with plaintiffs that under MCL 408.342(2), Robert was not participating in the sport of skiing when he was injured on the ski lift. At that time, he was working in his capacity as a volunteer ski patroller and taking a toboggan—an item used to help him do the job—back up the ski hill. While Robert's duties involved instructing, assisting, and facilitating skiers to engage in and participate in the sport, he himself was not a participant. He thus did not belong to the class of plaintiffs whose personal injury claims the Legislature sought to prevent by enacting the SASA. Accordingly, the SASA does not apply to bar his claims.

Even if the SASA applied to Robert, however, it would not apply to bar plaintiffs' claim. The SASA imposes specific obligations on ski operators concerning the safe operation of ski lifts. MCL 408.326 directs the Ski Area Safety Board (SASB) to "promulgate rules for the safe . . . use [and] operation . . . of all ski areas and ski lifts as the board finds necessary for protection of the general public while using ski areas and ski lifts." In keeping with this legislative mandate, the SASB promulgated Mich Admin Code, R 408.65, which provides, "A person shall construct, install, and operate a ski lift as prescribed in ANSI [American National Standards Institute] standards B77.1-2017 entitled 'American National Standard for Passenger Ropeways—Aerial Tramways, Aerial Lifts, Surface Lifts, Tows and Conveyors—Safety Standard,' which is adopted by reference in these rules." The applicable ANSI standards[1] regarding lift operator and attendant obligations provide guidance as to their respective duties. For example, 3.3.2.1 "Personnel and supervision" provides that "aerial lifts shall be operated by trained personnel, and the owner shall be responsible for their supervision and the training to perform the duties listed in 3.3.2.3." Further, 3.3.2.3 "Duties of operating personnel" provides that "[a]ll personnel shall use reasonable care while performing their duties." Specific to operators, the duty to use reasonable care extends to "assist in evacuation of the lift." 3.3.2.3.2(j). Lift attendants have a duty:

> to monitor the passengers' use of the aerial lift; including observing, advising and assisting them while they are in the attendant's work area as they embark on or disembark from the aerial lift; and to respond to unusual occurrences or conditions,

---

[1] Although the applicable ANSI standards were not cited by either of the parties, we nonetheless consider them in our de novo review because they are the governing law adopted by legislative mandate, promulgated by the SASB.

-6-

as noted.  The attendant should respond by choosing an appropriate action, which may include any of the following[:]

1 ) assisting the passenger;

2) slowing the aerial lift (if applicable);

3) stopping the aerial lift;

4) continuing operation and observation. [3.3.2.3.3(b).]

Attendants must further advise operators of any abnormal or unusual circumstances that may affect the safety of operations, and have a duty to advise and assist passengers with adaptive equipment. 3.3.2.3.3(d) and (g).

The SASA provides that if a skier *or* a ski operator violates the duties defined in the Act, the skier or operator "shall be liable for that portion of the loss or damage resulting from that violation."  MCL 408.344.  The evidence presented here can lead reasonable minds to conclude that Christina did not use reasonable care in loading the taboggan, and did not use reasonable care in making sure that Robert was safely secured with the taboggan before she turned her attention elsewhere.  The record indicates that Christina did not follow the procedures for loading toboggans onto a ski lift that Robert was familiar with, and that in the process of helping Robert load his toboggan, she caught one of his skis under the toboggan, which ultimately caused him to strike his ski on an unidentified object, twist on the chair, and fall 20 feet to the ground.  Robert was not injured as a result of a collision with "variations in terrain; surface or subsurface snow or ice conditions; bare spots; rocks, trees, and other forms of natural growth or debris; collisions with ski lift towers and their components, with other skiers, or with properly marked or plainly visible snow-making or snow-grooming equipment," MCL 408.342(2), which would ordinarily preclude liability, and does not bar plaintiffs' claims.  Instead, his injuries were the direct result of Christina's negligence in failing to properly assist him in loading himself and his toboggan onto the lift.  Accordingly, even if Robert were "participating" in the "sport of skiing" under the statute, he was not injured as a result of a danger "obvious and necessary," or otherwise inherent in the activity of skiing; rather, his injuries were due to Christina's failure to use due care.  The evidence here supports the conclusion that defendant, through its operator, violated the SASA.  Thus, under MCL 408.344, defendant is liable for the portion of loss or damage resulting from that violation. The trial court erred by concluding that the SASA bars plaintiffs' claims.

Defendant contends that regardless of whether Christina failed to use reasonable care in loading the toboggan and operating the lift, Robert assumed the risk of injury by being a participant in the sport of skiing who encountered a danger inherent to the sport.  See MCL 408.342(2). According to this argument, the SASA's assumption-of-risk provision trumps the statutory duties applicable to ski operators, as well as the Act's final provision providing for liability against any snowboarder or ski operator who "violates this act."  MCL 408.344.

As we discussed previously, we disagree that Robert was a "participant" in the "sport of skiing," and conclude that the assumption-of-risk statute does not apply to him.  Moreover, *even if it did*, this Court soundly rejected defendant's argument in *Rusnak v Walker*, 273 Mich App 299, 304-305; 729 NW2d 542 (2006).  Guided by *Rusnak*, we hold that even if the Act was applicable

to Robert, and Robert's fall resulted from an obvious and necessary risk inherent in the sport of skiing[2], he would nevertheless be eligible to recover damages to the extent that defendant's violation of the SASA caused his injury.

The plaintiff in *Rusnak* was injured in a collision with another skier. As the downhill skier, the plaintiff asserted that she had the right-of-way on the slope, and that the defendant had recklessly skied into her. *Id.* at 302. The trial court granted summary disposition in the defendant's favor, and this Court affirmed because it felt obligated to do so by previous caselaw. *Id.* at 301. However, the original *Rusnak* panel expressed disagreement with the prior binding cases[3], and this Court ultimately convened a conflict panel under MCR 7.215(J).

The conflict panel carefully elucidated the sections of the SASA setting forth the duties of skiers, the assumption-of-risk provision, and the directive that violators of the Act may be held liable for the damages they cause. *Id.* at 303-305. The Court observed that the SASA's assumption-of-risk language clearly contemplated that "collisions with other skiers are an obvious and necessary danger that inheres in the sport and that the skier has assumed the risk of being injured by such a danger." *Id.* at 304. But because the plaintiff established that the defendant may have violated his duties to ski responsibly as stated in MCL 408.341(1), the defendant could still bear liability "for that portion of the loss or damage resulting from that violation." *Id.* at 305, quoting MCL 408.344. Although the SASA's assumption-of-risk provision is "clear and unambiguous," the *Rusnak* panel declared it could not be enforced "in such a way that it renders meaningless another equally applicable section." *Id.* at 307-308. Rather, the defendant's acts "would be relevant for a comparative negligence evaluation[.]" *Id.* at 311.

*Rusnak* controls the outcome here. Although we reject defendant's argument that the assumption-of-risk provision applies to Robert, a contrary conclusion would not help defendant.

---

[2] In *Anderson v Pine Knob Ski Resort, Inc*, 469 Mich 20, 24; 664 NW2d 756 (2003), quoting MCL 408.342(2), the Supreme Court explained that "by skiing, skiers are held to have accepted certain types of risks from dangers that inhere in the sport as long as those dangers are 'obvious and necessary.' " MCL 408.432(2), *Anderson* explained, "identifies two types of dangers inherent in the sport." *Id.* The first are "natural hazards," and the second are "unnatural hazards," such as " 'collisions with ski lift towers and their components, with other skiers, or with properly marked or plainly visible snow-making or snow-grooming equipment.' " *Id.* at 24-25, quoting MCL 408.342(2). The examples of assumed hazards mentioned in the statute "all inhere in the sport of skiing and, as long as they are obvious and necessary to the sport, there is immunity from suit." *Id.* at 25.

[3] The conflict panel in *Rusnak*, recognized that the prior *Rusnak* panel felt bound by *Kent v Alpine Valley Ski Area, Inc*, 240 Mich App 731; 613 NW2d 383 (2000), *McCormick v Go Forward Operating Ltd Partnership*, 235 Mich App 551; 599 NW2d 513 (1999), and *Barr v Mount Brighton Inc*, 215 Mich App 512; 546 NW2d 273 (1996) to conclude that the SASA precluded liability against the defendant based on the assumption-of-risk statute. In concluding otherwise, *Rusnak* rejected the analysis in these cases. *Rusnak*, 273 Mich App at 310. Defendant relied heavily on *Kent*, and unpublished authority citing to *Kent*, to support its arguments. We do not find the arguments persuasive given that *Kent* is no longer controlling law in Michigan.

As *Rusnak* holds, and the statutory language provides, the Legislature did not intend that ski operators would enjoy absolute immunity when they violate a statutory duty. Rather, as the conflict panel pointed out in *Rusnak*, an injury caused by a defendant's violation of the Act is not an assumed risk barring recovery. *Id*. at 307. Even were we to find that the assumption-of-risk statute applies to Robert, defendant would remain responsible for its proportionate share of the fault for Robert's damages. To hold otherwise would nullify the duty provisions of the statute as well as MCL 408.344.

The trial court erred by concluding that the SASA bars plaintiffs' claims.

## B. RELEASE

This conclusion does not end our analysis, however. Even though the SASA does not bar plaintiffs' claims, Robert signed a release form that defendants contend absolves them of all responsibility for the injuries he sustained while skiing. The release states, in relevant part:

> I understand and accept that downhill skiing and/or snowboarding in its various forms is an inherently hazardous and dangerous activity. Such activities include many risks including the risk of serious injury and death. I freely and knowingly accept and voluntarily assume all risks of property damage, personal injury and death to me while on the premises of the ski areas.

> I hereby expressly release from liability the ski area, its agents, employees, directors, officers, shareholders, ski patrollers, ski instructors, affiliates, partners, corporations, associations and the like from any and all claims, actions, causes of action, demands, rights, damages, costs, loss of services, expenses, and compensation whatsoever which the undersigned now has or which may hereafter accrue on account of any foreseen or unforeseen bodily injuries and/or damages.

> I represent and warrant that this release extends to my heirs, executors, administrators, successors, spouse, dependents, children and assign[s] and I hereby freely and voluntarily acquit and forever discharge any cause of action for the consideration of a reduced charge for a season ski pass and access to the ski area for an entire ski season.

The release form itself generically applies to release defendants from liability for injuries sustained while Robert or his family are engaged in recreational skiing. The only evidence that it was actually applicable to Robert in his capacity as a ski patroller is a handwritten label at the top of the form stating the words "ski patrol."

Plaintiffs raise two arguments regarding the release: 1) that it does not apply to Robert, and 2) that it was against public policy to require Robert to sign it. Regarding the release's application to Robert, plaintiffs argue that it is inapplicable because Robert was working as a volunteer ski patroller when he was injured. The release indicates that by signing it, Robert accepted that "downhill skiing" is inherently dangerous and absolved defendants of any liability for injuries incurred while skiing. Plaintiffs further contend that "downhill skiing," which is not defined in the release, is different from "volunteer ski patrolling."

-9-

In construing contractual language, the goal "is to determine the intent of the contracting parties," the best indicator of which is the language used. *Quality Prod & Concepts Co v Nagel Precision, Inc*, 469 Mich 362, 375; 666 NW2d 251 (2003). "This Court examines contractual language and gives the words their plain and ordinary meanings[,]" *Coates v Bastian Bros, Inc*, 276 Mich App 498, 503; 741 NW2d 539 (2007), while also giving "effect to every word or phrase as far as practicable." *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 467; 663 NW2d 447 (2003). If the language of the contract is unambiguous, then it is "reflective of the parties' intent as a matter of law." *Quality Prod & Concepts Co*, 469 Mich at 375. "[U]nambiguous contracts are not open to judicial construction and must be enforced as written." *Rory v Continental Ins Co*, 473 Mich 457, 468; 703 NW2d 23 (2005). A contract is ambiguous if its provisions are capable of more than one interpretation or its provisions irreconcilably conflict. *Klapp*, 468 Mich at 467; *Coates*, 276 Mich App at 503. However, "[c]ourts may not impose an ambiguity on clear contract language." *Coates*, 276 Mich App at 503.

The trial court erred by holding that the release barred plaintiffs' claims. It is clear from the language of the release that it was designed to broadly absolve defendants of any liability for injuries sustained while skiing. By logical extension, it would appear to apply to injuries Robert or his family might sustain while skiing for recreation. However, nothing in the plain terms of the contract indicates that it applied to injuries sustained while Robert was getting on a ski lift during a shift as a ski patroller. The mere presence of the handwritten words "ski patrol" on the form does not automatically indicate that Robert knew that *the contents of the release* applied to his activities as a ski patroller. Extrinsic evidence in the record regarding the nature of the agreement also sheds little light on the subject. Robert testified at his deposition that all ski patrollers ski for free, and the perk of the job is that each patroller's family also gets to ski for free for an entire ski season. He further testified that if he did not sign the release, he could not serve as a volunteer ski patroller. Beyond that, it is unclear whether he understood that defendants intended for the release, which says nothing on its face regarding volunteer activities, applied to injuries sustained while working as a volunteer ski patroller. Thus, the terms of the contract are ambiguous, and on this record, summary disposition was inappropriate.[4]

## IV. CONCLUSION

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Sima G. Patel
/s/ Michelle M. Rick
/s/ Kathleen A. Feeney

---

[4] Because we conclude that reversal is warranted because the contract was ambiguous and unenforceable, we decline to address plaintiffs' alternative argument that the release violated public policy.